# Exhibit 2

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

Case 4:23-cv-01789 Document 21-3 Filed on 06/28/23 in TXSD Page 2 of 23

2017 WL 5985598

KeyCite Yellow Flag - Negative Treatment

Distinguished by Ameranth, Inc. v. ChowNow, Inc., S.D.Cal., August 19, 2021

2017 WL 5985598
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

IN RE: QUALCOMM LITIGATION,

Case No.: 17-cv-00108-GPC-MDD

Signed 11/08/2017

**REDACTED ORDER:**

**(1) GRANTING IN PART AND DENYING IN PART APPLE'S MOTION TO DISMISS COUNT X OF QUALCOMM'S FIRST AMENDED COUNTERCLAIMS**

**(2) GRANTING QUALCOMM'S MOTION FOR PARTIAL DISMISSAL OF APPLE'S FIRST AMENDED COMPLAINT**

**(3) GRANTING QUALCOMM'S MOTION FOR PARTIAL DISMISSAL OF CONTRACT MANUFACTURERS' COUNTERCLAIMS**

Hon. Gonzalo P. Curiel, United States District Judge

\*1 Presently before this Court are: (1) Apple's Partial Motion to Dismiss Qualcomm's First Amended Counterclaims (Dkt. No. 77); (2) Qualcomm's Motion For Partial Dismissal of Apple's First Amended Complaint (Dkt. No. 100), and (3) Qualcomm's Motion for Partial Dismissal of the Contract Manufacturer's [1] Counterclaims (Dkt. 116, Case No. 3:17-cv-1010-GPC-MDD). These motions have been fully briefed. On October 13, 2017 the Court heard oral argument as to all three motions to dismiss.

For the reasons set forth below, the Court will: (1) **GRANT** in part and **DENY** in part Apple's Motion to Dismiss Count X of Qualcomm's Counterclaims with Leave to Amend; (2) **GRANT** Qualcomm's Motion to Dismiss the Additional Patents-in-Suit in Apple's First Amended Complaint with

Leave to Amend; (3) **GRANT** Qualcomm's Motion to Dismiss the Additional Patents-in-Suit in the Contract Manufacturers' Counterclaims with Leave to Amend.

**I. PROCEDURAL HISTORY**
On July 21, 2017, Counterclaim-Defendant Apple Inc. ("Apple") filed its Partial Motion to Dismiss Count X of Counterclaim-Plaintiff Qualcomm's First Amended Counterclaims. Dkt. No. 77 ("MTD-1"). Qualcomm filed an opposition on August 9, 2017, and Apple filed its reply on September 5, 2017. Dkt. Nos. 112, 131.

On August 8, 2017, Defendant Qualcomm filed a Motion for Partial Dismissal of Apple's First Amended Complaint which seeks to dismiss for lack of declaratory judgment jurisdiction nine patents-in-suit that were added in Apple's First Amended Complaint and are described in Paragraphs 148-56. Dkt. No. 100 ("MTD-2"). Plaintiff Apple filed an opposition on August 18, 2017 and Qualcomm filed a reply on September 1, 2017. Dkt. Nos. 119, 127. On August 8, 2017, Counterclaim-Defendant Qualcomm filed a Motion for Partial Dismissal of the Contract Manufacturers' Counterclaims, which seeks to dismiss for lack of declaratory judgment jurisdiction the same nine patents-in-suit at issue in their Dkt. No. 100 motion to dismiss. Dkt. No 116, Case No. 3:17-cv-1010-GPC-MDD ("MTD-3"). The Contract Manufacturers, the Counterclaim-Plaintiffs, filed a response on September 1, 2017. Dkt. No. 129, Case No. 3:17-cv-1010-GPC-MDD. Qualcomm filed a reply on September 13, 2017. Dkt. No. 146. [2]

On January 20, 2017, Apple filed its Complaint. Dkt. No. 1. The Court denied Qualcomm's motion for an anti-suit injunction seeking to stay international litigation on September 7, 2017. Dkt. No. 141. The Court also denied Qualcomm's request for a preliminary injunction against the Contract Manufacturers. Dkt. No. 138, Case No. 3:17-cv-1010-GPC-MDD. On September 13, 2017, the Court granted Apple's motion to consolidate the case with Case No. 3:17-cv-01010. Dkt. No. 144.

**II. MOTION TO DISMISS STANDARD**
**a. 12(b)(1)**
\*2 Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a defendant may seek to dismiss a complaint for lack of jurisdiction over the subject matter. The federal court is one of limited jurisdiction. *See Gould v. Mutual Life Ins. Co.*

2017 WL 5985598

v. *New York*, 790 F.2d 769, 774 (9th Cir. 1986). As such, it cannot reach the merits of any dispute until it confirms its own subject matter jurisdiction. *See* *Steel Co. v. Citizens for a Better Environ.*, 523 U.S. 83, 95 (1998). Plaintiff, as the party seeking to invoke jurisdiction, has the burden of establishing that jurisdiction exists. *See* *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

A case that lacks Article III standing must be dismissed for a lack of subject matter jurisdiction. *See* *Maya v. Centex Corp.*, 658 F.3d 1060, 1066-67 (9th Cir. 2001). Since standing is essential to a federal court's subject matter jurisdiction, the issue of standing is properly raised in a Rule 12(b)(1) motion to dismiss. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

### b. 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While a plaintiff need not give "detailed factual allegations," a plaintiff must plead sufficient facts that, if true, "raise a right to relief above the speculative level." *Id.* at 545. "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). Legal conclusions, however, need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d

1191, 1200 (9th Cir. 2003); *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). Moreover, a court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Mktg. Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998).

### III. Apple's Motion to Dismiss Qualcomm's First Amended Counterclaims

Apple seeks to dismiss Count X of Qualcomm's First Amended Counterclaims pursuant to Rule 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and California Business & Professions Code Section 17204. MTD-1.

### A. Background

On September 16, 2016, Apple released two versions of the iPhone 7. Qualcomm's First Amended Counterclaims ("Counterclaims"), ECF No. 70 ¶ 238. [3] Each iPhone contains a baseband processor chipset, which allows the iPhone to connect to cellular networks. *Id.* ¶¶ 134, 136-37. iPhone 7's on certain networks such as AT&T have Intel chipsets. *Id.* ¶¶ 239, 246. iPhone 7's on other networks such as Verizon have Qualcomm chipsets. *Id.* From 2007 to 2010, Apple relied exclusively on chips made by Infineon, which Intel acquired in 2011. *Id.* ¶ 136. Between 2011 until Fall 2016, Qualcomm was the only cellular chipset supplier for new iPhones. *Id.* ¶ 239. The Qualcomm-based iPhone 7 can reach download speeds up to 600 megabits per second. *Id.* ¶ 240. The Intel-based iPhone 7 can only reach download speeds up to 450 megabits per second. *Id.*

**\*3** Qualcomm alleges that in order to create "artificial parity" between the Qualcomm-based iPhone 7 and the Intel-based iPhone 7, Apple decided not to utilize capabilities in the Qualcomm-based phones that could increase download speeds by 25% or 150 megabits per second. *Id.* ¶ 241. Due to this decision, Qualcomm-based iPhone 7's run at speeds closer to Intel-based iPhone 7's, but Qualcomm-based iPhone 7's appear to still perform better than Intel-based iPhone 7's. *Id.* ¶¶ 241, 244. Qualcomm asserts that the decision not to use the enhanced features prevented a more capable iPhone 7 from reaching the market, thereby potentially impeding efficiency of other users on the network leading to an inefficient allocation of bandwidth across a cellular network. *Id.* ¶ 242.

2017 WL 5985598

Qualcomm asserts that Apple made explicit threats to force Qualcomm not to reveal the disparity between the iPhones. Apple "made clear to Qualcomm" that disclosure of the chip set disparity would jeopardize Qualcomm's business prospects of selling future chipsets to Apple, and would "severely impact Qualcomm's standing as a supplier to Apple." *Id.* ¶ 243. In an August 2016 call, an Apple executive allegedly told a Qualcomm executive that Apple would use its marketing organization to "retaliate against Qualcomm" if Qualcomm publicly compared the performance of the Qualcomm-based and Intel-based iPhones. *Id.*

Further, Qualcomm alleges that independent studies showed significant performance disparities between the Intel and Qualcomm versions of the iPhone 7. *Id.* ¶ 245. A November 18, 2016 Bloomberg article [4] reported that the Verizon iPhone 7, which uses Qualcomm's X12 chipset, was faster than the Intel-based AT&T version of the iPhone 7, but was still "not as fast as it could be." *Id.* ¶ 246. The same article found that the Samsung Galaxy S7, which utilizes the full capabilities of the Qualcomm X12 chipset, is twice as fast as a Qualcomm-based iPhone 7. *Id.* ¶ 247.

Apple publicly denied the performance disparity stating that "there [were] no discernible difference[s] in the wireless performance of any of the models." *Id.* ¶ 248. Qualcomm asserts that absent Apple's conduct, their chipsets would be in higher demand and Qualcomm would have been able to sell more chips to Apple to meet that demand. *Id.* ¶ 250.

### B. UCL—Standing and Actual Reliance

"[T]o state a claim for a violation of the [California UCL], a plaintiff must allege that the defendant committed a business act that is either fraudulent, unlawful, or unfair." *Levine v. Blue Shield of Cal.,* 189 Cal. App. 4th 1117, 1136 (2010). Each adjective captures a "separate and distinct theory of liability." *Rubio v. Capital One Bank,* 613 F.3d 1195, 1203 (9th Cir. 2010) (internal marks omitted). The UCL is "intentionally broad to give the court maximum discretion to control whatever new schemes may be contrived, even though they are not yet forbidden by law." *People ex rel. Renne v. Servantes,* 86 Cal. App. 4th 1081, 1095 (2001). A claim "grounded in fraud" must satisfy the heightened pleading requirements to plead with particularity under Rule 9(b). *Vess v. Ciba-Geigy Corp.,* 317 F.3d 1097, 1103-04 (9th Cir. 2003). In cases where some fraudulent and some non-

fraudulent conduct is alleged, only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements. *Id.* at 1104.

**\*4** The UCL imposes an actual reliance requirement on plaintiffs who bring a UCL action based on a fraud theory, because "reliance is the causal mechanism of fraud." *Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC,* No. 14-cv-0437-CW, 2015 WL 3377662, at *6 (N.D. Cal. Feb. 24, 2015). Plaintiffs must allege their own reliance on alleged misrepresentations, rather than the reliance of third parties. *See, e.g.,* *O'Connor v. Uber Techs., Inc.,* 58 F. Supp. 3d 989, 1002 (N.D. Cal. 2014) ("UCL fraud plaintiffs must allege their *own* reliance—not the reliance of third parties—to have standing under the UCL.")

In Count X, Qualcomm alleges that Apple violated the UCL through three theories—(1) attempting to cover up performance differences between Qualcomm and Intel-based iPhone 7's; (2) publicly claiming there was "no discernible difference" between these models; and (3) threatening Qualcomm to prevent consumers from insisting on the superior Qualcomm-based iPhones. Counterclaims ¶ 383. In its opposition, Qualcomm appears to have narrowed its claim only to the third assertion that Apple threatened Qualcomm with retaliation and relies tangentially on the other assertions as support for the threat theory. Opp-1 at 1, 7-8.

The Court finds that Qualcomm's first two bases for a UCL claim, to the extent they remain at issue, are "premised on a fraud theory" involving misrepresentations and omissions. *See, e.g.,* Counterclaim ¶ 243 ("Apple *concealed* the superiority of the Qualcomm-Based iPhone 7"); *id.* ¶ 248 ("an Apple spokesperson *falsely claimed* that there was no difference between the Qualcomm-based iPhones and the Intel-based iPhones."). Consequently, Qualcomm must allege reliance "irrespective of whether the claims are asserted under the fraud prong or the unfair prong of the UCL." *L.A. Taxi Cooperative v. Uber,* 114 F. Supp. 3d 852, 867 (N.D. Cal. 2015).

Qualcomm has not adequately pled with specificity facts indicating its *own* reliance on any alleged Apple omission or misrepresentation. Qualcomm was always aware of the superiority of its chips before the launch of the iPhone 7 and discussed public disclosure of this fact with Apple before the iPhone 7's launch date. Counterclaims ¶¶ 239-240, 243, 248. As a result, because Qualcomm has not plead its own reliance

Case 4:23-cv-01789 Document 21-3 Filed on 06/28/23 in TXSD Page 5 of 23

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

on a misrepresentation and cannot rely on the third-party reliance of Apple's customers, Qualcomm lacks standing under the UCL to bring these claims. *See* 🚩 *L.A. Taxi*, 114 F. Supp. 3d at 866-87.

However, the Court finds that Qualcomm's UCL claim based on Apple's alleged threats is *not* based in on a theory of fraud because it does not involve a misrepresentation or omission. *See* 🚩 *Vess*, 317 F.3d at 1103 (for a claim to sound in fraud, the claim must allege a misrepresentation (false representation, concealment, or nondisclosure)); *id.* (finding that Plaintiff's allegations did not rely entirely on unified fraudulent course of conduct and that specific claims were not "grounded in fraud"). As a result, the Court will analyze whether Apple's alleged threats to Qualcomm were "unfair" under California's UCL. [5] The Court will also assess whether Qualcomm has adequately alleged statutory standing under California Business and Professions Code Section 17204.

Accordingly, the Court **GRANTS** Apple's Motion to Dismiss Count X as to the theories that (1) Apple attempted to cover up the performance differences between the Qualcomm and Intel phones and (2) Apple publically misrepresented that there was no "discernible difference" between the phones.

### C. Statutory Standing Under Section 17204

**\*5** To satisfy statutory standing, a party must (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that the economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim. 🚩 *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) (citing California Business and Professions Code § 17204). Proposition 64 established the requirement that plaintiffs alleging UCL claims must demonstrate some form of economic injury. 🚩 *Id.* at 323. The California Court has held that there are "innumerable ways in which economic injury from unfair competition may be shown." *Id.* The quantum of injury necessary to satisfy this requirement requires only that plaintiff "allege some specific 'identifiable trifle'" of injury. *Id.* (citations omitted). The notion of "lost money" under the UCL is not limited and "loss of business to a competitor as a result of unfair competition is a paradigmatic, and indeed the original, variety of loss contemplated by the UCL." *AngioScore Inc. v. TriReme Medical, LLC*, 70 F. Supp. 3d 951, 962 (2014) (citing 🚩 *Law*

*Offices of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal. App. 4th 544, 561 (2013)). At the pleading stage, general allegations of injury resulting from the defendant's conduct are sufficient because on a motion to dismiss the court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." 🚩 *Kwikset*, 51 Cal. 4th at 328. *See also* 🚩 *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104-05 n.4 (9th Cir. 2013); *A.P. Deauville, LLC v. Arion Perfume & Beauty, Inc.*, No. C14-03343 CRB, 2014 WL 7140041, at \*5 (N.D. Cal. Dec. 12, 2014).

The requirement that the party asserting standing under the UCL lose money or property as a result of unfair competition "imposes a causation requirement." *Lorenzo v. Qualcomm Inc.*, No. 08CV2124 WQH LSP, 2009 WL 2448375, at \*5 (S.D. Cal. Aug. 10, 2009) (citing 🚩 *Hall v. Time Inc.*, 158 Cal. App. 4th 847, 855 (2008)). "The phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing of a causal connection or reliance on the alleged misrepresentation." 🚩 *Hall*, 158 Cal. App. 4th at 855.

Apple argues that Qualcomm has not sufficiently alleged loss of money or property as a result of Apple's unfair conduct. MTD-1 at 8, 11-12. Apple argues that Qualcomm's primary assertion of injury—"[a]bsent Apple's conduct, Qualcomm's chipsets would be in higher demand, and Qualcomm would be able to sell more chips to Apple to meet that demand"—is conclusory because Qualcomm has failed to show that any consumers would or could have purchased a Qualcomm-based iPhone 7 over a Intel-based iPhone 7. Counterclaims ¶ 383. In particular, Apple challenges that Qualcomm has not alleged sufficient facts to assert any injury because consumer choice is also informed by a consumer's choice of carrier such as AT&T and Verizon. *See* MTD-1 at 18. Qualcomm responds that its allegations of a loss of customers, as well as its "loss of goodwill and product image, and loss of business relationships" constitute allegations sufficient to support standing under the UCL. Opp-1 at 10.

Given the nature of the UCL's "expansive standing doctrine," the Court finds that Qualcomm has adequately alleged statutory standing. *See* *AngioScore*, 70 F. Supp. 3d at 962. Qualcomm need only allege an "identifiable trifle" of injury and has sufficiently done so by alleging it has lost customers, goodwill, and the loss of business relationships.

*See* 🚩 *Kwikset*, 51 Cal. 4th at 324; 🚩 *Storm Mfg. Grp., Inc. v. Weather Tec Corp.*, 2013 WL 5352698, at \*7-8 (C.D. Cal Sep.

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

Case 4:23-cv-01789 Document 21-3 Filed on 06/28/23 in TXSD Page 6 of 23

23, 2013) (plaintiffs had statutory standing where they alleged that unfair conduct caused the loss of customers, damaged goodwill, and diminished their product's value); *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 165 F. Supp. 3d 937, 948 (S.D. Cal. 2016) (finding standing where plaintiff alleged lost sales, market share, and goodwill); *AngioScore*, 70 F. Supp. 3d at 962 (loss of business is a paradigmatic form of UCL injury). Counterclaims ¶¶ 383. *See also id.* ¶ 385 (alleging loss of goodwill and product image, and loss of business relationships). Contrary to Apple's assertion, because generalized allegations of injury suffice, Qualcomm is not required to plead specific facts indicating injury. *See* *Kwikset*, 51 Cal. 4th at 328. What Apple alleges is missing from Qualcomm's claim—for example, an assertion that specific customers would have changed carriers from AT&T to Verizon to obtain higher speed Qualcomm-based iPhones if Qualcomm had not been threatened by Apple—is the type of specific fact that the California Supreme Court and Ninth Circuit have held need not be pled at the motion to dismiss stage. *See id.*; *Hinojos*, 718 F.3d at 1104; *A.P. Deauville*, 2014 WL 7140041, at *5.

**\*6** Qualcomm must also show that its economic injury is the result of Apple's unfair business practice. *Kwikset*, 51 Cal. 4th at 322. There is a sufficiently direct chain of causation. Here, Apple's alleged threats to stop using Qualcomm as a supplier and to retaliate against Qualcomm with its marketing organization led Qualcomm not to reveal the iPhone 7 speed disparity to the public. As Qualcomm stated at oral argument implicit in that chain of causation is that customers would switch carriers if they knew of the speed disparities between the phones. *See* Dkt. No. 162 at 43. As a result, consumer demand for their chipsets was lower than it would have been if the disparity would have been revealed. Accordingly, Qualcomm's allegations of lost potential sales to Apple, goodwill, and business relationships sufficiently support a finding of statutory standing. *See, e.g.*, *Luxul Tech, Inc. v. Nectarlux, LLC*, 78 F. Supp. 3d 1156, 1174 (N.D. Cal. 2015) (finding standing where defendants alleged unfair conduct consisted of defamatory statements to customers questioning the validity of plaintiff's patents and resulted in lost customers and potential sales revenue); *Overstock.com, Inc. v. Gradient Analytics, Inc.* 151 Cal. 4th 688, 716 (2007) (finding standing under UCL where plaintiff pled that defendant's unfair business practice—intentional dissemination of false negative reports—resulted in diminution in value of plaintiff's assets and decline in market capitalization).

The Court will **DENY** Apple's motion to dismiss on this basis.

### D. "Unfair" Prong of the UCL

Prior to *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 184 (1999), California courts determined whether a practice was "unfair" in the direct competitor context by applying a balancing test "weigh[ing] the utility of the defendant's conduct against the gravity of the harm to the alleged victim" or by assessing whether a practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." In *Cel-Tech*, the California Supreme Court rejected these tests in the direct competitor context as "too amorphous" because they "provide[d] too little guidance to courts and businesses." 20 Cal. 4th at 185. Accordingly, the California Supreme Court held that for direct competitors an "unfair" practice is one that "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significant threatens or harms competition." *Id.* at 187.

However, California law is unsettled with regard to the correct standard to apply to non-competitor consumer suits. *Lozano v. AT&T Wireless Services, Inc.*, 504 F.3d 718, 735 (9th Cir. 2007); *Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1273-74 (2006) (discussing the split between California Courts of Appeal). This confusion arises in part because the *Cel-Tech* Court expressly limited its holding refining the test to only claims brought by a business competitor alleging anticompetitive practices. *Cel-Tech*, 20 Cal. 4th at 187 n.12.

There are three primary consumer tests: (1) the "tethering test," which requires that the "public policy which is a predicate to a consumer unfair competition action under the 'unfair' prong of the UCL must be tethered to specific constitutional, statutory, or regulatory provisions,"; (2) the "balancing test," which examines whether the challenged business practice is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim," *In re Adobe Systems, Inc. Privacy Litigation*, 66 F. Supp.

Case 4:23-cv-01789 Document 21-3 Filed on 06/28/23 in TXSD Page 7 of 23
In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 5985598

3d 1197, 1226 (N.D. Cal. 2014); and (3) the FTC test which requires that the alleged consumer injury must be substantial; must not be outweighed by any countervailing benefits to consumers or competition; and must be an injury that consumers themselves could not reasonably have avoided.

See Camacho v. Automobile Club of Southern California, 142 Cal. App. 4th 1394, 1403 (2006). Pending resolution of the issue by the California Supreme Court, the Ninth Circuit has approved the use of either the balancing or tethering tests in consumer actions. Ferrington v. McAfee, Inc., No. 10-cv-01455, 2010 WL 3910169, at *12 (N.D. Cal. Oct. 5, 2010) (citing Lozano, 504 F.3d at 736).[6]

### 1. *Cel-Tech* Test

**\*7** As an initial matter, this Court must determine whether to apply the *Cel-Tech* test to the instant case by assessing the nature of the relationship between Qualcomm and Apple.

Qualcomm argues that the *Cel-Tech* test does not apply because Qualcomm and Apple are not direct competitors. Opp-1 at 2. Qualcomm asserts that it does not make and sell consumer cellular devices and is merely a chip supplier. Opp-1 at 14. Apple responds in a footnote that "Qualcomm would have the Court treat it—the dominant supplier of baseband chipsets—as if it were a consumer" and that such a result would "open the courts to UCL claims any time two companies in a vertical business relationship entered into negotiations resulting in economic losses." Reply-1 at 5 n.3.

In Levitt v. Yelp! Inc., 765 F.3d 1123 (9th Cir. 2014) the Ninth Circuit recognized that the *Cel-Tech* test was not limited strictly to direct competitors. There, several business owners sued the online review company Yelp alleging that Yelp created negative reviews and manipulated content to induce the business owners to purchase advertisements on the site. *Id.* at 1127. The Court applied the *Cel-Tech* test and held that "[a]lthough this case is not a suit involving unfairness to the defendant's competitors, as Yelp does not compete with the business owners, the crux of the business owners' complaint is that Yelp's conduct unfairly injures their economic interests to the benefit of other businesses who choose to advertise with Yelp." *Id.* at 1136 (internal citations and marks omitted). Here, it can be similarly said that "as [Apple] does not compete with [Qualcomm], the crux of [Qualcomm's] complaint is that [Apple's] conduct

unfairly injures [its] economic interests to the benefit of [Intel]." *See id. See also* Sun Microsystems, Inc. v. Microsoft Corp., 87 F. Supp. 2d 992, 999 (N.D. Cal. 2000) (finding Sun Microsystems, a vertical supplier, to be direct competitors with Microsoft); Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc., 178 F. Supp. 2d 1099, 1117–18 (C.D. Cal. 2001) (viewing contractually obligated supplier and plaintiff as "ostensible competitor[s]" and applying strict *Cel-Tech* test); Nat'l Rural Telecommunications Co-op. v. DIRECTV, Inc., 319 F. Supp. 2d 1059, 1076 (C.D. Cal. 2003), on reconsideration in part (June 5, 2003) (applying *Cel-Tech* test where DIRECTV disputed that it was not a competitor with plaintiff).

The Court finds the relationship between Qualcomm and Apple—which is akin to that of direct competitors—is such that the *Cel-Tech* test is the best fit under the facts of this case. Qualcomm and Apple are sophisticated corporations with an ongoing business relationship. The primary bases of Qualcomm's UCL claim—that Apple threatened its status as a supplier and threatened marketing retaliation—sounds of an accusation of anticompetitive conduct between two competitors. *See* Cel-Tech, 20 Cal. 4th at 187 (applying *Cel-Tech* test where competitor alleged "anticompetitive practices"); Reply-1 at 5 (asserting that the parties are "sophisticated corporations, and the gravamen of Qualcomm's counterclaim is that Apple chose a **competitor's** chipset") (emphasis in original). *See also* Dkt. 162 at 38 (statement by Apple at oral argument that "obviously the Qualcomm-Apple relationship is not a competitor relationship, but the Qualcomm-Intel relationship is a competitor relationship"). Consequently, the Apple-Qualcomm relationship is far closer to a competitor relationship than a consumer relationship.

**\*8** Accordingly, under the *Cel-Tech* test Qualcomm must show that Apple's conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." Qualcomm has not adequately pled that Apple's alleged threats threaten an incipient violation of any antitrust law or the spirit or policies of those laws. Broad references to telecommunications policy and the policy of consumer choice are entirely tangential to the focal point of its UCL claim—commercial harm to *Qualcomm*—not the broader public or consumer good. *See, e.g.,* Opp-1 at 20-21.

Case 4:23-cv-01789   Document 21-3   Filed on 06/28/23 in TXSD   Page 8 of 23

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

Moreover, Qualcomm has not shown that Apple's conduct "significantly threatens or harms competition." If anything, Apple's actions have *benefitted* competition by promoting the development of Intel as an alternative chip supplier.

*See* 🚩 *Cel-Tech*, 20 Cal. 4th at 185 (cautioning against the "enjoining of *pro* competitive conduct") (emphasis in original).

Accordingly, the Court will **GRANT** Apple's motion to dismiss based on the *Cel-Tech* test. In the alternative, the Court will also consider the tethering and balancing tests below. *See Worldwide Travel, Inc. v. Travelmate US, Inc.*, 2015 WL 1013704, *12 (S.D. Cal. Mar. 9, 2015)* (applying the *Cel-Tech*, tethering, and balancing tests where parties had disagreement whether plaintiffs were "competitors" or "consumers").

## 2. Tethering Test

Under the Tethering test, an unfair act or practice "predicated on public policy" requires that the public policy that serves as the predicate to the action must be " ' tethered' to specific constitutional, statutory, or regulatory provisions."

*See* 🚩 *Gregory v. Albertsons, Inc.*, 128 Cal. Rptr. 2d 389, 395 (Ct. App. 2002); *Smith v. Specialized Loan Servicing, LLC*, No. 16CV2519-GPC(BLM), 2017 WL 1711283, at *9 (S.D. Cal. May 3, 2017)*; 🚩 *Drum*, 182 Cal. App. 4th at 257 (describing the tethering test as a consumer test that is similar to the *Cel-Tech* test). Qualcomm's UCL claim is not "predicated" on the public policy of telecommunications statutes, but rather on Apple's threats to retaliate against Qualcomm. *See* Opp-1 at 15. Qualcomm's policy arguments that Apple's conduct violates the public policies underlying cellular and wireless communication statutory and regulatory provisions related to the "inefficient allocation of bandwidth to iPhones" do not form the core of its complaint. Accordingly, under this test Qualcomm's claim fails for the reasons stated above with respect to competitor cases—plaintiff fails to allege a plausible violation or incipient violation of any statutory or regulatory provision.

*See* 🚩 *Drum*, 182 Cal. App. 4th at 257.

## 3. Balancing Test

Finally, the Court will consider the balancing test. Apple argues that the Court should reject the balancing test because it is outdated and not viable post *Cel-Tech* given (1) the need for a standardized definition of "unfair" for consumer and competitor cases and (2) because it is a vague and amorphous test. MTD at 18 n.3 (citing Stern, Rutter Group Practice Guide: 🚩 Business & Professions Code Section 17200 § 3:119). While the Ninth Circuit in *Lozano* observed that "*Cel-Tech* effectively rejects the balancing approach," it went on to affirm the district court's use of the balancing test. 🚩 *Lozano*, 504 F.3d at 736 ("In the absence of further clarification by the California Supreme Court, we endorse the district court's approach to the law as if it still contained a balancing test."). While the Court observes that the test has been criticized, it is also apparent that some federal district courts and some of the California Courts of Appeal have continued to apply the "balancing" test. *See, e.g.*, ⚠️ *Ferrington v. McAfee, Inc.*, 2010 WL 3910169, *13 (N.D. Cal. Oct. 5, 2010)*; ⚠️ *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457 (2006); 🚩 *Aguilar v. General Motors, LLC*, 2013 WL 5670888, at *6 (E.D. Cal. 2013)* (stating that the traditional balancing test "has been used more widely and analyzed more thoroughly by California courts."); 🚩 *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999).

 ***9** The Court takes this opportunity to clarify the apparent origins of two related approaches that have both been construed as the "balancing test." Some California appellate courts have interpreted the test to require only that the court "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Id.* Other courts have applied a second version of the balancing test, which mandates that plaintiffs show that a practice is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." 🚩 *Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1260 (2006).

In *Cel-Tech*, the court considered these two tests as separate tests. *See* 🚩 *Cel-Tech*, 20 Cal. 4th at 184 (separately describing the tests); 🚩 *Gregory*, 104 Cal. App. 4th at 852 (same). The first test ("*Motors, Inc.* Test"), requires an examination of the practice's impact on its alleged victim, balanced against the reasons, justifications, and motives of the alleged wrongdoer. 🚩 *State Farm Fire & Cas. Co. v.*

Case 4:23-cv-01789   Document 21-3   Filed on 06/28/23 in TXSD   Page 9 of 23

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

*Superior Court*, 45 Cal. App. 4th 1093, 1103-04 (1996) (citing 🚩 *Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (Ct. App. 1980)). In contrast, the second line ("*Sperry & Hutchinson* Test"), finding a practice "unfair" when it "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," originates from 🚩 *People v. Casa Blanca Convalescent Homes, Inc.*, 159 Cal. App. 3d 509, 530 (1984) which in turn cited FTC guidelines sanctioned by the Supreme Court in 🚩 *FTC v. Sperry & Hutchinson*, 405 U.S. 233 (1972).

Confusion as to what constitutes the pre-*Cel-Tech* "balancing test" arises because later case law melded the *Motors, Inc.* balancing test and *Sperry & Hutchinson* test together in the consumer context, defining "unfair" as "prohibiting conduct that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." 🚩 *Smith v. State Farm Mutual Automobile Ins. Co.*, 93 Cal. App. 4th 700, 718-19 (2001). *See also* 🚩⚠️ *McKell v. Washington Mut. Inc.*, 142 Cal. App. 4th 1457, 1473 (2006) ("A business practice is unfair within the meaning of the UCL if it violates established public policy or if it is immoral, unethical, oppressive, or unscrupulous and causes injury to consumers which outweighs its benefits."); 🚩 *South Bay Chevrolet, 72 Cal App. 4th at 887 (citing both tests but applying only the Motors, Inc. balancing test)*. Federal district courts, relying on California case law, have similarly applied a melded definition as the "balancing test." *See, e.g.*, 🚩 *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1050 (N.D. Cal. 2014); 🚩⚠️ *Ferrington*, 2010 WL 3910169, at *13.

Given the historical origins of the two tests as *separate* analyses, the Court will treat the "balancing test" as a two-factor analysis, first considering whether or not the unfair conduct at issue was "immoral, unethical, oppressive, unscrupulous or substantially injurious" to the harmed party. [7] Next, the Court will weigh the practice's impact on its alleged victims against the reasons, justifications, and motives of the alleged wrongdoer. By doing so, the Court assesses not only the utility of the defendant's conduct and the gravity of the harm to the alleged victim, but also the nature of the conduct at issue.

**\*10** First, Apple's conduct cannot be reasonably construed as "immoral, unethical, oppressive, unscrupulous, or substantially injurious" to Qualcomm. Apple's alleged threats challenging Qualcomm's status as a supplier are justified by Apple's right to choose with whom it does business. *See, e.g.*, 🚩 *United States v. Colgate & Co.*, 250 U.S. 300, 308 (1919); 🚩 *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009); *cf.* 🚩 *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 253 (Cal App. 2010) (bar association's unilateral refusal to sell its membership list to a particular buyer was not "immoral, unethical, or unscrupulous" and consequently was not "unfair" under UCL).

In addition, Qualcomm's marketing retaliation allegations are so vague that the Court cannot reasonably find that the conduct was "immoral, unethical, oppressive, unscrupulous, or substantially injurious" to Qualcomm. Undisputedly, Apple has a First Amendment right to market its products and respond to criticisms regarding the performance of its products. *See* 🚩 *Bigelow v. Virginia*, 421 U.S. 809, 818 (1975) (protection of First Amendment extends to commercial speech). Given the vagueness of Apple's alleged threat to retaliate through marketing and mindful of Apple's First Amendment rights, Qualcomm's UCL claim of "unfair" competition based on marketing retaliation is not plausible and jeopardizes Apple's right of free speech. The Court finds unpersuasive Qualcomm's assertion at oral argument that such retaliatory conduct might be considered "oppressive." Dkt. No. 162 at 50. Accordingly, under the *Sperry & Hutchinson* analysis, Qualcomm has not sufficiently alleged facts to show that Apple's conduct was "immoral, unethical, oppressive, unscrupulous, or substantially injurious."

Second, applying the *Motors, Inc.* weighing test, Qualcomm alleges harm to its business by asserting that Qualcomm's chipsets would be in higher demand and would have sold more chipsets absent Apple's threatening conduct. Counterclaims ¶ 250, 383. Qualcomm further asserts that Apple's threatening conduct hurt Qualcomm's goodwill and product image, and reduced incentives to develop next-generation technologies. *Id.* ¶ 384-85. Qualcomm's allegations are conclusory and do not adequately support the extent of the alleged harm produced by threats to engage in an amorphous marketing campaign.

As to utility, Qualcomm pleaded that there was "no utility to any of Apple's unfair acts." Counterclaims ¶ 386. At

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

Case 4:23-cv-01789   Document 21-3   Filed on 06/28/23 in TXSD   Page 10 of 23

oral argument, Apple asserted that it had not yet presented its utility arguments because of the stage of the litigation, but referred the Court to a Bloomberg article cited by Qualcomm for possible utility rationales. Schlabach Decl., Ex. 1. According to Apple, these reasons include: (1) to ensure a uniform iPhone experience; (2) to keep component costs in check as a pro-competitive objective; and (3) to keep wireless carriers happy. Dkt. No. 162 at 32. Qualcomm argues that these rationales do not involve the utility of Apple's challenged conduct—threats to Qualcomm. The Court disagrees with this assessment given that Apple's alleged threats to discontinue Qualcomm's status as a supplier and launch a retaliatory marketing campaign are directly connected with the business rationales discussed in the Bloomberg article.

Ultimately, the Court finds that even under the balancing test, Qualcomm has not presented a plausible claim. Here, under the *Sperry & Hutchinson* assessment, Qualcomm has made no showing that Apple's conduct was "immoral, unethical, oppressive, unscrupulous, or substantially injurious." [8] This alone is enough to dismiss Qualcomm's claim. The Court will not sanction the use of the UCL to prohibit conduct that at its core promoted procompetitive activity through the development of Intel as an alternative chip supplier.

**\*11** Accordingly, the Court will **GRANT** Apple's motion to dismiss Count X of Qualcomm's First Amended Complaint on this basis.

### 4. Safe Harbor

A business practice cannot be unfair if it is permitted by law. *Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1505 (1999). "The UCL does not apply if the Legislature has expressly declared the challenged business practice to be lawful in other statutes." *Id.* at 1505-06. A court may not allow a plaintiff to "plead around an absolute bar to relief simply by recasting the cause of action as one for unfair competition." *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000). However, the limitation is *narrow* because in order "to forestall an action under Section 17200, another provision must actually bar the action or *clearly permit* the conduct." *Cel-Tech*, 20 Cal. 4th at 183 (emphasis added); *Chabner*, 225 F.3d at 1048.

In *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001), the Court of Appeal held that conduct alleged to be "unfair" because it unreasonably restrains competition and harms consumers, such as the resale price maintenance agreement at issue in that case, was not unfair if the "conduct is deemed reasonable and condoned under the antitrust laws."

Apple argues that *Chavez* forecloses Qualcomm's UCL claim under any test. Qualcomm asserted that Apple threatened Qualcomm that the company's revelation of the iPhone speed disparity to the public would "severely impact Qualcomm's standing as a supplier." Counterclaims ¶ 243. According to Apple, they are absolutely protected from a UCL claim by the *Colgate* doctrine which affords Apple the right to select with whom to do business and on what terms. MTD-1 at 15-16. In *United States v. Colgate & Co.*, 250 U.S. 300, 308 (1919), the Supreme Court held that "in the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell."

The Court will not apply the safe harbor provisions from *Chavez* at this juncture. Unlike in *Chavez* and *City of San Jose v. Office of the Com'r of Baseball*, 776 F.3d 686, 692 (9th Cir. 2015), Qualcomm has not pled an antitrust violation in conjunction with its UCL claim. Accordingly, a primary rationale of *Chavez*—"[i]f the same conduct is alleged to be both an antitrust violation and an unfair practice business act or practice ... the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers."—is absent in this case. *See City of San Jose*, 776 F.3d at 692 (barring independent UCL claim because MLB's activities were lawful under antitrust laws). *See also Chavez*, 93 Cal. App. 4th 363, 375 ("To permit a separate inquiry into *essentially the same question* under the unfair competition law would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct.")

**\*12** Furthermore, Apple has not shown that the legislature has expressly declared that the specific conduct Qualcomm alleges is "clearly permitted." Qualcomm accuses Apple of two primary threats—(1) threatening Qualcomm's "standing

Case 4:23-cv-01789   Document 21-3   Filed on 06/28/23 in TXSD   Page 11 of 23

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

as a supplier" if Qualcomm disclosed the iPhone speed disparity and (2) stating Apple would use its marketing organization to retaliate against Qualcomm. Counterclaims ¶ 243. [9] *Cel-Tech* requires more than the unfair practice be permitted conduct; it must be deemed *clearly* permitted by the legislature. Accordingly, the Court will **DENY** Apple's Motion to Dismiss on this basis.

### E. Conclusion

For the foregoing reasons, the Court will **GRANT** Apple's motion to dismiss Count X of Qualcomm's First Amended Complaint as Qualcomm has not pled a plausible claim under the *Cel-Tech*, tethering, or balancing tests. The Court will **DENY** Apple's motion as to standing and safe harbor. The Court will grant leave to amend as any attempt to cure the pleading's deficiencies would not be futile. *See DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

### IV. Qualcomm's Motion to Dismiss Apple's First Amended Complaint

Qualcomm's Motion to Dismiss seeks to dismiss for lack of subject matter jurisdiction nine patents-in-suit that were added by Apple in its First Amended Complaint ("FAC"). MTD-2 at 3.

### A. Extrinsic Evidence

On a motion to dismiss for lack of subject matter jurisdiction pursuant to 12(b)(1), "the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction" without converting the motion into one for summary judgment. *McCarthy v. United States,* 850 F.2d 558, 560 (9th Cir. 1988). Further, under the incorporation by reference doctrine, the district court may take into account documents whose "contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [ ] pleadings." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). Apple agrees with Qualcomm that the licensing correspondence should be reviewed and attached in its opposition six exhibits further detailing the correspondence between Qualcomm and Apple relevant to the nine Additional Patents-in-Suit. Opp-2 at 3 n.3. Accordingly, the Court finds that it may review extrinsic evidence to resolve the factual dispute related to jurisdiction and that the exhibits presented by both Apple and Qualcomm are relevant to whether the

court has declaratory judgment jurisdiction. As such, the Court will consider (1) Exhibits 1-2 to the Declaration of Nathan Hamstra In Support of Qualcomm's Motion to Dismiss; (2) Exhibits A-G to the Declaration of Seth Sproul In Support of Apple's Opposition; (3) Exhibit 1 to the Declaration of Nathan Hamstra In Support of Qualcomm's Reply.

### B. Background

The FAC divides the patents-in-suit into two groups—the "Original Patents-in-Suit" from the original complaint and the nine additional patents "Additional Patents-in-Suit" added in the First Amended Complaint. FAC ¶¶ 127, 146. In its FAC, Apple stated that it had identified "nine additional patents" that "appeared on the March 18, 2016 list that Qualcomm sent to Apple as alleged evidence that Apple should pay Qualcomm's usurious non-FRAND royalties." FAC ¶ 146. For each of these patents, Apple seeks a declaration of non-infringement, invalidity, or that the Court set a FRAND royalty. FAC ¶¶ 428-574.

**\*13** In contrast, the Original Patents-in-Suit appear not only on the March 18, 2016 list, but are either a U.S. counterpart to a Chinese patent asserted by Qualcomm in litigation or a U.S. patent for which Qualcomm provided infringement allegations in claim charts during the parties' licensing negotiations in December 2016. FAC ¶ 140. In short, the Original Patents-in-Suit either appear on claim charts that Qualcomm presented to Apple or are Chinese counterparts to patents asserted in the *Meizu* litigation. Apple asserts that the Original Patents-in-Suit are the patents "which Qualcomm believes have the strongest infringement reads." FAC ¶ 41. Qualcomm does not seek to dismiss the Original Patents-in-Suit in this instant motion.

Apple and Qualcomm began direct licensing discussions around November 2014. FAC ¶ 119. In February 2016, Qualcomm and Apple engaged in renewed direct patent licensing discussions. Sproul Decl., Ex. F at 1. In a February 17, 2016 letter, Qualcomm responded to Apple's inquiry to explain why Qualcomm thought Apple's products infringed by stating: "Apple products have been certified as compliant with CDMA/WCDMA (3G) and LTE (4G) networks around the world." FAC ¶ 137; Sproul Decl., Ex. F at 2. Qualcomm asserted that a demand for "claim charts" for each essential patent against each Apple product would be [redacted text] Sproul Decl., Ex. F at 2.

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

Qualcomm also informed Apple that it would provide a complete list of patents disclosed to ETSI and asserted that "Apple products that have been certified as compliant with a standard necessarily practice every patent claim that is essential to any mandatory portions of that standard." FAC ¶ 137; Sproul Decl., Ex. F at 2.

On March 18, 2016, Qualcomm sent Apple a chart consisting of 1,975 pages of patent numbers, for over three thousand U.S. and Chinese patent families. ("March 18 List"). These charts include titles, abstracts, and identification of specifications for which particular patents were disclosed to relevant standard setting organizations as potentially essential to the standard. Hamstra Decl. ISO MTD, Ex. 1. In a letter simultaneously sent with the chart, Qualcomm asserted that the March 18 List included patents "disclosed to ETSI as potentially containing ESSENTIAL IPR (as that term is used in the ETSI IPR Policy)." Qualcomm further asked Apple "whether any of the listed portions of the standards are not implemented in the Apple products that are UMTS- or LTE-capable."

On April 18, 2016, Apple—having considered the March 18 List—sent Qualcomm a letter asking Qualcomm to [redacted text] the SEPs it believed Apple infringed and to provide [redacted text] noting that [redacted text] Hamstra Decl. ISO MTD, Ex. 2 at 2. At the end of its letter, Apple reiterated its request and asked Qualcomm to re-send a list that Qualcomm [redacted text] *Id.* (emphasis in original).

On June 12, 2016, Qualcomm wrote to Apple that they had already provided their [redacted text] Sproul Decl, Ex. E at 2. Qualcomm also offered to present "claim reads" for representative SEPs in Qualcomm's portfolio.

On November 11, 2016, Qualcomm wrote to Apple stating that [redacted text] Sproul Decl., Ex. D at 1.

On December 5, 2016, Qualcomm stated that it would be willing to provide claim charts under the terms of a confidentiality agreement and proposed a series of dates for the claim chart reviews and included a list of attorneys to be present. Sproul Decl., Ex. A at 2. In these discussions, Qualcomm explained that it had prepared "over 100 claim charts" to share with Apple. Sproul Decl., Ex. B.

In December 2016, Qualcomm presented claim charts with regard to 23 patents. *See* FAC ¶¶ 132-136; Reply-2 at 2. On January 12, 2017, Qualcomm offered to "address follow-up questions" Apple had about the patent families Qualcomm had already presented and offered to "present the next batch of claim charts" to Apple. Hamstra Decl. ISO Reply, Ex. 1 at 5. On January 18, 2017, Apple responded to Qualcomm stating an intention to meet regarding the additional claim charts on February 2, 2017. *Id.* at 4. However, this meeting never occurred because Apple filed suit against Qualcomm in this matter on January 20, 2017. Dkt. No. 1.

### C. Declaratory Judgment Act and Standing

**\*14** The Declaratory Judgment Act provides that:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). The plaintiff seeking the Declaratory Judgment bears the burden of showing the existence of an "actual controversy" sufficient to confer Article III jurisdiction. *Organic Seed Growers & Trade Ass'n v. Monsanto Co.*, 718 F.3d 1350, 1354 (Fed. Cir. 2013).[10]

Under the test recently established in *MedImmune*, the Court assesses whether "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Post-*MedImmune*, the Federal Circuit held that the prior standard requiring a "reasonable apprehension of suit" had been overruled, *Monsanto*, 718 F.3d at 1355, though proving a reasonable apprehension remains "one of multiple ways that a declaratory judgment plaintiff may satisfy the all-the-circumstances test to establish a justiciable Article III controversy." *Prasco, LLC v. Medicis Pharm. Corp*, 537 F.3d 1329, 1336 (Fed. Cir. 2008).

The Federal Circuit has subsequently held that a party seeking declaratory judgment under *MedImmune* must show: "(1) an

Case 4:23-cv-01789   Document 21-3   Filed on 06/28/23 in TXSD   Page 13 of 23

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

affirmative act by the patentee relating to the enforcement of his patent rights and (2) meaningful preparation to conduct potentially infringing activity." 🚩 *Ass'n for Molecular Pathology v. U.S. Patent & Trademark Office*, 689 F.3d 1303, 1318 (Fed. Cir. 2012) (citing 🚩 *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380-81 (Fed. Cir. 2007) and 🚩 *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 880 (Fed. Cir. 2008)). Here there is no dispute as to the second factor because Apple long engaged in the sale and, through its Contract Manufacturers, the production of iPhones and iPads.

*See* 🚩 *ActiveVideo Networks, Inc. v. Trans Video Electronics, Ltd.*, 975 F. Supp. 2d 1083, 1086 (N.D. Cal. 2013).

The *MedImmune* "all the circumstances" analysis is "calibrated to the particular facts of each case." 🚩 *Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1328 (Fed. Cir. 2012). There is no bright-line rule applicable to patent cases, but "Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do."

🚩 *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380–81 (Fed. Cir. 2007). "Jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement." *Id.* More is required than "a communication from a patent owner to another party, merely identifying its patent and the other's product line," and how much more is decided on a "case-by-case analysis."

🚩 *3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1378–79 (Fed. Cir. 2012). On the other end of the spectrum, there is necessarily declaratory judgment jurisdiction if a party has actually been charged with infringement. *Id.*

**\*15** In 🚩 *Cepheid v. Roche Molecular Systems, Inc.*, No. C-12-4411-EMC, 2013 WL 184125, at \*6 (N.D. Cal. Jan. 17, 2013) and 🚩 *ActiveVideo*, 975 F. Supp. 2d at 1087, Judge Chen laid out the medley of factors to be considered in the affirmative act determination:

> (1) the strength of any threatening language in communications between the parties;
>
> (2) the depth and extent of infringement analysis conducted by the patent holder;

> (3) whether the patent holder imposed a deadline to respond;
>
> (4) any prior litigation between the parties;
>
> (5) the patent holder's history of enforcing the patent at issue;
>
> (6) whether the patent holder's threats have induced the alleged infringer to change its behavior;
>
> (7) the number of times the patent holder has contacted the alleged infringer;
>
> (8) whether the patent holder is simply a holding company with no source of income other than enforcing patent rights;
>
> (9) whether the patentee refused to give assurance it will not enforce its patent;
>
> (10) whether the patent holder has identified a specific patent and specific infringing products;
>
> (11) the extent of the patent holder's familiarity with the product prior to suit;
>
> (12) the length of time that transpired after the patent holder asserted infringement; and
>
> (13) whether communications initiated by the declaratory judgment plaintiff have the appearance of an attempt to create a controversy in anticipation of filing suit.

The Court analyzes the most relevant factors below.

### 1. Depth and Extent of Infringement Analysis

The Court finds that the depth and extent of infringement analysis on the Additional Patents-in-Suit weighs strongly in Qualcomm's favor. In *SanDisk*, defendant STM presented to the declaratory judgment plaintiff SanDisk a "thorough infringement analysis" detailing claims STM believed infringed their patents on an "element-by-element" basis, and provided to the plaintiff over 300 pages of materials for each of the fourteen patents under discussion and asserted that it had made a "studied and determined infringement determination." 🚩 480 F.3d at 1382. The depth and extent of STM's infringement analysis weighed in favor of finding that SanDisk had declaratory judgment jurisdiction.

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

Here, Qualcomm has never accused Apple of infringing the Additional Patents-in-Suit. MTD-2 at 6. Qualcomm asserts that the 1,975 page list provided to Apple on March 18, 2016 is simply an identification of the universe of patents previously declared as potentially essential to a standard. *See* Hamstra Decl., Ex. 1. Qualcomm has not stated that the Additional Patents-in-Suit are "actually essential" to a standard practiced by Apple. MTD-2 at 7. Consequently no detailed infringement analysis has been performed as to the Additional Patents-in-Suit. Qualcomm's twenty-three claim charts, from which Apple chose six as the Original Patents-in-Suit, would appear to be the type of "thorough infringement analysis" contemplated in *SanDisk*. However, this level of in-depth analysis does not appear to have been conducted as to the Additional Patents-in-Suit and accordingly this factor weighs strongly against Apple. *See* 🔖 *3M v. Avery Dennison Corp.*, 673 F.3d 1372, 1379 (Fed. Cir. 2012) (statement that Avery had analyzed a specific 3M product and that "claim charts would be forthcoming" signaled intent to escalate dispute sufficient to warrant declaratory judgment jurisdiction).

**\*16** Apple argues that Qualcomm has raised the specter of "hundreds of additional claim charts." Opp-2 at 4. Qualcomm responds that they have never presented or even referred to claim charts in connection with the Additional Patents-in-Suit. Reply-2 at 2 ("These patents were never specifically discussed with Apple, let alone charted or presented.").

At this stage, it is Apple's burden to prove that declaratory judgment jurisdiction existed at the time the counterclaims were filed. *See* 🔖 *Benitec Austl., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007). Apple has not sufficiently pled that the nine Additional Patents-in-Suit were part of the "hundreds" of claim charts prepared by Qualcomm in the licensing negotiations.

Here, the complete absence of detailed infringement analysis as to the Additional Patents-in-Suit weighs severely against finding declaratory judgment jurisdiction.

### 2. Strength of Threatening Language in Communications

The "Strength of Threatening Language" in Qualcomm's communications with Apple also weighs in favor of disallowing Declaratory Judgment jurisdiction.

The Court has reviewed the licensing communications between Apple and Qualcomm and finds that Qualcomm did not use threatening language in its communications to indicate that it would imminently to assert its patent rights. [11] *Compare* 🔖 *ABB Inc. v. Cooper Indus.*, LLC, 635 F.3d 1345, 1348 (Fed. Cir. 2011) (patent holder assertion that it would "act vigorously to protect its rights" weighed in favor of establishing declaratory judgment jurisdiction); 🔖 *MedImmune*, 549 U.S. at 121-22 (patent holder delivered a letter to declaratory judgment plaintiff expressing its expectation that petitioner would pay royalties because the accused product was covered by patent) *with* Sproul Decl., Ex. E at 3 [redacted text]")

Apple asserts that Qualcomm has effectively charged Apple with infringement, arguing that the "overall tenor" of licensing communications asserted a threat that Apple must take a license on Qualcomm's entire SEP portfolio. Opp-2 at 11. In a letter dated June 12, 2016, Qualcomm wrote to Apple:

[redacted text]

Sproul Decl, Ex. E at 2. The statement that [redacted text]" does not necessarily evince an affirmative act sufficient to create an actual controversy because Apple's products were and currently are licensed through the Contract Manufacturers. *See* Reply-2 at 2. Moreover, the plain text of this communication is not necessarily threatening. Qualcomm clearly delineates between two categories of patents: (1) essential patents implemented that would infringe absent a license and (2) potentially essential patents that Qualcomm disclosed to SSOs. Consequently, Qualcomm does not appear to be threatening Apple with infringement of its potentially essential patents—i.e. those included on the March 18 List.

### 3. Deadline to Respond

This factor weighs marginally in Qualcomm's favor. Qualcomm did not impose a deadline to respond in any of its correspondence. *See* 🔖 *Hewlett-Packard Co. v. Acceleron* LLC, 587 F.3d 1358, 1362 (Fed. Cir. 2009) (finding declaratory judgment jurisdiction in part because Acceleron twice imposed a two-week deadline on HP to respond sufficient to constitute an affirmative act). Instead, Qualcomm's correspondence seems to indicate an intent to

2017 WL 5985598

move forward and push for in-person meetings to further good faith negotiations. *See* Sproul Decl., Ex. E at 3.

### 4. Prior Litigation between the Parties and Patent Holder's History of Enforcing the Patents-In-Suit

**\*17**  These factors weigh marginally in favor of Apple. There does not appear to have been direct prior litigation between Apple and Qualcomm regarding these patents. Nonetheless, Apple asserts that Qualcomm is "increasingly aggressive with respect to its assertions regarding its cellular SEP portfolio" and points to Qualcomm's lawsuit against Meizu, a Chinese smartphone maker, and Qualcomm's lawsuit against the contract manufacturers in the now-consolidated '1010 case. Opp-2 at 5.

In *Prasco, LLC*, the Federal Circuit held that prior litigious conduct was a circumstance to be considered in the totality of the circumstances analysis. 537 F.3d at 1341. However, in that case, the court found that a prior suit "concerning different products covered by unrelated patents" could not alone "create a real and immediate controversy," and was entitled only to "minimal weight" in analyzing whether a controversy was created. *Id.*

Here, Qualcomm has previously engaged in litigation involving its patent portfolio against Meizu. Yet, none of the Additional Patents-in-Suit were at issue in that case. Nonetheless, three of the Original Patents-in-Suit are directly related to the Meizu litigation as counterparts to patents asserted in that litigation. Accordingly, the Court finds that Qualcomm's overall recent history of litigation weighs—albeit minimally—in Apple's favor, and is not a dispositive factor. [12]

### 5. Whether The Patent Holder has Identified a Specific Patent And Specific Infringing Products

This factor weighs strongly in Qualcomm's favor. Qualcomm asserts that the facts of this case are analogous to *Applera v. Michigan Diagnostics, LLC*, 594 F. Supp. 2d 150 (D. Mass. 2009). Apple argues that *Applera* does not apply because it is not binding and because the "patentee there did not declare that its patents were essential." Opp-2 at 13.

In *Applera*, Defendant Michigan Diagnostics sought a declaration of non-infringement as to sixty-two Applied Biosystems patents. Plaintiff Applera (through its Division Applied Biosciences) alleged infringement of seven of the sixty-two patents in an amended complaint. *Id.* at 155. Counsel for Applera sent a letter to Michigan Diagnostics asking the company to review Applera's U.S. patent portfolio and included an enclosure of sixty-two patents. The Court found that the correspondence between the parties "besp[oke] the lack of any *specific* dispute" finding that there was no particularized and concrete dispute as to the fifty-five particular patents. The Court stated:

> Applied Biosystems broadly, and with some palpable bravura, suggested a review of its entire patent portfolio, but it did not make any *specific allegations of infringement* except within its pleading in this lawsuit. Nor has Michigan Diagnostics, after apparently conducting a review of Applied Biosystems' patents, argued that it might be infringing on any of these patents but for their invalidity. In short, it is far from clear that any dispute actually exists as to the fifty-five patents. As to them it may be fairly said that Michigan Diagnostics is essentially seeking an advisory opinion. There is no jurisdiction for that essay.

*Id.* at 160.

Qualcomm may have participated in a similar "palpable bravura" in suggesting to Apple to review its entire portfolio. Nonetheless, similar to *Applera*, Qualcomm has not made specific allegations of infringement as to the Additional Patents-in-Suit, nor has Qualcomm presented claim charts relating to these patents.

**\*18**  Further, the licensing correspondence reveals that Apple explicitly recognized that Qualcomm was not actually alleging infringement as to the thousands of patents on the March 18 List. For example, in an April 14 letter, Apple asked Qualcomm to identify each SEP it believed Apple infringed

Case 4:23-cv-01789   Document 21-3   Filed on 06/28/23 in TXSD   Page 16 of 23
In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

and to [redacted text]" As part of a list of next steps, Apple explicitly asked for a list of SEPs Qualcomm "[redacted text]" by Apple, along with claim charts to demonstrate this infringement. Hamstra Decl., Ex. 2 at 2-3 (emphasis in original).

Accordingly, Qualcomm's lack of specificity in identifying precise infringing patents weighs severely against finding declaratory judgment jurisdiction for the Additional Patents-in-Suit. *See also Samsung Electronics Co., Ltd. v. Texas Instruments, Inc.*, No. 3:96-cv-1, 1996 WL 343330 (N.D. Tex. Apr. 18, 1996) (dismissing claims where general representations during licensing negotiations concerning portfolio of nearly 4,000 patents were made for "posturing" and "persuasion and strategy during extended licensing negotiations")[13]; *HP*, 587 F.3d at 1362 (finding dispute justiciable where patentee twice contacted plaintiff asserting rights against specific products under a specific patent); *ActiveVideo*, 975 F. Supp. 2d at 1091 (finding declaratory judgment jurisdiction where letter included identification of two specific patents); *Cepheid*, 2013 WL 184125, at *11-*13 (dismissing declaratory judgment claims as to one challenged patent where patentee had sued on different patents but never made threats to sue on the specific patent); *GoDaddy.com LLC v. RPost Commc'ns Ltd.*, No. CV-14-00126-PHX-JAT, 2014 WL 6908520 (D. Ariz. Dec. 9, 2014) ("Simply listing a patent among numerous other patents in pre-suit communications from a patent owner to a potential infringer is insufficient to establish a justiciable controversy.").

### 6. Whether Patentee has Failed to Give Assurance that it will not Enforce its Patent

This factors weighs in favor of Apple. Qualcomm has not provided to Apple an assurance that it will not sue for infringement as to the Additional Patents-in-Suit pursuant to *Super Sack Manufacturing Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058-59 (Fed. Cir. 1995). *See* Opp-2 at 11 n.7. Nonetheless, a patentee's failure to give assurances that it will not enforce its patents is not dispositive. *See ActiveVideo*, 975 F. Supp. 2d. at 1088; *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1341 (Fed. Cir. 2008) (stating that "[a] patentee has no obligation to spend the time and money to test a competitors' product nor to make a definitive determination, at the time and place of the

competitors' choosing, that it will never bring an infringement suit").

### 7. "All the Circumstances" Conclusion

Apple's argument is that Qualcomm's assertion of its entire portfolio in negotiations puts every patent in that portfolio necessarily into play for declaratory judgment. Based on the above *Cepheid* and *ActiveVideo* factors, the Court finds that this premise is not supported by the caselaw which requires an affirmative act to constitute a "case or controversy" sufficient to warrant declaratory judgment jurisdiction.

Under Apple's position, Apple would currently have declaratory judgment jurisdiction over not only the Additional Patents-in-Suit and Original Patents-in-Suit but also the thousands of patents listed as "potentially essential" as part of Qualcomm's ETSI disclosures in the 1,975 page list. MTD-2 at 9. Apple could assert Declaratory Judgment jurisdiction over patents that have never been at issue including, for example, U.S. patent 6,353,412, a Method and Apparatus for Determining Position Location Using Reduced Number Of GPS Satellites And Unsynchronized Base Stations, which neither appears in any licensing discussion, nor has ever been specifically referenced by Qualcomm or Apple as a patent that Qualcomm might assert in an infringement action. This reach is too broad in light of the Federal Circuit's requirement of an affirmative act.

**\*19** In light of the (1) complete absence of detailed infringement analysis as to the Additional Patents-in-Suit; (2) the lack of threatening communications from Qualcomm to Apple; (3) the lack of a deadline to respond; and (4) most importantly the lack of specific identification of the Additional Patents-in-Suit, the Court finds that there is not an affirmative act sufficient to establish Declaratory Judgment jurisdiction as to the Additional-Patents-in-Suit. Qualcomm has never specifically identified the Additional Patents-in-Suit in any licensing correspondence, and has never provided claim charts to Apple regarding these particular patents. The Court recognizes that Qualcomm owns a large portfolio of SEPs and that these patents were part of the FRAND offer made to Apple. Apple's argument—that the patents were included on the March 18 List, that Qualcomm had prepared over one hundred claim charts, and had litigated against another smartphone maker—do not establish an affirmative act as to the Additional Patents-in-Suit. The law of declaratory judgment jurisdiction requires more specificity and more

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

Case 4:23-cv-01789   Document 21-3   Filed on 06/28/23 in TXSD   Page 17 of 23

2017 WL 5985598

detailed infringement analysis than mere identification in a 1,975 page list.

Accordingly, the Court **GRANTS** Qualcomm's Motion to Dismiss Apple's claims regarding the nine Additional Patents-in-Suit. The Court will grant leave to amend as any attempt to cure the pleading's deficiencies would not be futile.

See 🚩 *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

### V. Qualcomm's Motion to Dismiss the Contract Manufacturers' Counterclaims

Qualcomm also brings a motion to dismiss the Contract Manufacturers' Counterclaims ¶¶ 40-66 related to the same nine Additional Patents-in-Suit. MTD-3. Qualcomm observes that the Contract Manufacturers' counterclaims are "substantively identical" to Apple's declaratory judgment claims. [14] MTD-3 at 2.

#### A. Threats Toward Apple Extending to the Contract Manufacturers

The Contract Manufacturers argue that Qualcomm's alleged threats toward Apple extend to the CMs, and thereby create declaratory judgment jurisdiction. Opp-3 at 1. Qualcomm's primary argument is that it has never accused any Contract Manufacturer of infringing the Additional Patents-in-Suit, and furthermore never raised specific patents in any licensing correspondence with the Contract Manufacturers. As the Court has declined to find declaratory jurisdiction as to Apple, the Court will similarly decline to find declaratory jurisdiction on this basis.

The Court observes that the Contract Manufacturers appear to have a weaker argument than Apple based on a "threat" theory. 🚩 *Arris Group v. British Telecommunications PLC,* 639 F.3d 1368, 1375 (Fed. Cir. 2011), which the Contract Manufacturers cite to establish Declaratory Jurisdiction over the Contract Manufacturers' counterclaims is inapposite. There, the Federal Circuit found a justiciable controversy between a patent holder and supplier because the supplier was "directly and substantially involved" in infringement negotiations between the patent holder and customer. 🚩 *Id.* at 1377. Here, the Contract Manufacturers have not plead that they participated in *any* licensing discussions about the Additional Patents-in-Suit. Furthermore, just as no claim charts were provided to Apple on these patents, no claim

charts regarding the Additional Patents-in-Suit were provided to the Contract Manufacturers. Indeed, no claim charts *at all* were presented to the Contract Manufacturers because the primary licensing discussions were between Apple and Qualcomm. Reply-3 at 3.

Consequently, the Court will not find that it has declaratory judgment jurisdiction on the theory that Qualcomm's threats to Apple extended to the Contract Manufacturers. Accordingly, the Court **GRANTS** Qualcomm's motion to dismiss on this basis.

#### B. Licensing Argument

The Contract Manufacturers also assert an independent basis for jurisdiction—their status as licensees under their respective Licensing Agreements ("SULAs") with Qualcomm. Opp-3 at 5. The SULAs grant a patent license to certain Qualcomm patents including SEPs and NEPs (non standard essential patents). Dkt. No. 1, Case No. 17-cv-1010 ¶ 47. Qualcomm has asserted that "[a]bsent Defendants' License Agreements, the cellular products they manufacture (for Apple and others) would infringe many thousands of patents in Qualcomm's portfolio." *Id.* ¶ 41. The Court will analyze under the *MedImmune* standard whether the Contract Manufacturers have met their burden to show (1) a case or controversy of sufficient immediacy and reality and (2) that a declaratory judgment as to the Additional Patents-in-Suit would affect the legal relationship between Qualcomm and the Contract Manufacturers and finally and conclusively resolve the underlying controversy.

#### 1. Controversy of "Sufficient Immediacy and Reality"

**\*20** The Contract Manufacturers argue that it is "well established that a party has standing to bring a declaratory judgment action for patents to which that party had a license, but now refuses to pay royalties." Opp-3 at 6 (citing 🚩 *C.R. Bard, Inc. v. Schwartz,* 716 F.2d 874, 881-82 (Fed. Cir. 1983) (finding jurisdiction where licensee had ceased payment of royalties but had not yet terminated contract); 🚩 *MedImmune,* 549 U.S. at 128 (no dispute that there would be declaratory judgment jurisdiction if petitioner had taken "the final step of refusing to make royalty payments under the [ ] license agreement.")). Accordingly, under *MedImmune*, refusing to make royalty payments under a license agreement—as the Contract Manufacturers have

Case 4:23-cv-01789   Document 21-3   Filed on 06/28/23 in TXSD   Page 18 of 23

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

in this case—weighs in favor of finding a "substantial controversy ... of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *See* 🚩 *MedImmune,* 549 U.S. at 127; Counterclaims ¶ 241-42.

### 2. Adverse Legal Interests and Whether Declaratory Relief Would Affect the Legal Relationship Between the Parties

The Court must also determine whether there are sufficient "adverse legal interests" between the parties such that a favorable determination as to the Additional Patents-in-Suit will affect the legal relationship between the parties and adequately redress any injuries.[15]

In *MedImmune* the Supreme Court emphasized a long line of case law holding that a litigant may not use a declaratory judgment action to "obtain piecemeal adjudication of defenses that would not finally and conclusively resolve the underlying controversy." 🚩 549 U.S. at 128 n.7 (citing 🚩 *Calderon v. Ashmus,* 523 U.S. 740, 749 (1998)). Further, the Court reiterated that a declaratory judgment must "touch[ ] the legal relations of parties having adverse legal interests" and "admi[t] of specific relief through a degree of a conclusive character." 🚩 *MedImmune,* 549 U.S. at 127 (citing 🚩 *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227 (1937)). Consequently, *MedImmune* teaches that this Court has no place wading into a controversy that does not affect the legal relationship between the parties. Further, the party seeking to base jurisdiction on the Declaratory Judgment Act bears the burden of proving that the facts alleged meet the *MedImmune* test, and must show *inter alia* that "there is a substantial controversy, between the parties having adverse legal interests." *See* 🚩 *Benitec Australia, Ltd. v. Nucleonics, Inc.,* 495 F.3d 1340, 1343 (Fed. Cir. 2007).

Qualcomm argues that in order to establish standing the CMs must show that the declaratory relief they are requesting would be likely to finally and conclusively resolve the underlying controversy between the parties. Reply-3 at 7.

Qualcomm points to 🚩 *Verance Corp. v. Digimarc Corp.,* 2011 WL 2182119 (D. Del. June 2, 2011) to argue that there is no case or controversy where royalty payments in a license agreement are not contingent on the validity or noninfringement of specific patents.

In *Verance,* the court declined to find declaratory judgment jurisdiction holding that because the terms of the relevant License Agreement did not tie Verance's obligation to pay royalties to patent infringement or validity, a declaration of invalidity or noninfringement as to the patents at issue would not "admit of specific relief through a decree of conclusive character." *Id.* at *6. The court paid careful attention to the licensing agreement[16] between Verance and Digimarc to conclude that no provision in the Verance License Agreement made royalty payments "contingent on the validity or infringement of any Digimarc patents." *Id.* at *1. The *Verance* court distinguished *MedImmune* based on the *MedImmune* agreement's[17] emphasis on patent invalidity and noninfringement. 🚩 *Verance,* 2011 WL 2182119, *6 ("But unlike the license in *MedImmune,* the License Agreement in this case defines Verance's obligation to pay royalties without regard to patent infringement or validity."). The court in 🚩 *Miotox LLC v. Allergan, Inc.,* No. 2:14-cv-08723, 2015 WL 2084493, *4 (C.D. Cal May 5, 2015) applied a similar analysis and looked at the language of the license agreement to determine whether royalties were sufficiently tied to patent invalidity and infringement such that a declaratory judgment would redress the legal relations between the parties. There, the License Agreement defined a Licensed Product as "any medical product containing Botulinum Toxin or other toxin made, used, or sold by LICENSEE ... whose use is *covered by a Valid Patent Claim.*" *Id.* The Court held that since royalties[18] were tied to sales of products covered by the patents, the dispute could not be resolved without deciding the validity of the patents. *Id.*

**\*21** Here, the amount of royalties that the CMs owe to Qualcomm are not dependent on whether the Additional Patents-in-Suit are valid or infringed. This is because each SULA requires the CMs to pay a percentage of the [redacted text] that will vary based only on the volume of sales. What matters for the SULA royalties is the [redacted text]; an invalidity or noninfringement determination as to the Nine Patents-in-Suit would not alter the legal relationship between the CMs and Qualcomm. The licensing language in the SULAs is closer to the *Verance* License—where royalties were not tied to invalidity or noninfringement— than to the language in *MedImmune* and *Miotox* where the language explicitly contained references to patent validity and noninfringement. *Compare* 🚩 *Verance,* 2011 WL 2182119, *1 (defining Licensed Products without reference to patent invalidity or noninfringement) *with* 🚩 *Miotox,* 2015 WL

Case 4:23-cv-01789   Document 21-3   Filed on 06/28/23 in TXSD   Page 19 of 23

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

2084493, *4 (defining the Licensed Product with reference to any medical product sold "whose use is *covered by a Valid Patent Claim*"); *MedImmune*, 549 U.S. at 122 (defining Licensed Product as antibodies that if not for the license infringe the relevant patents and "which have neither expired nor been held invalid").

At oral argument, the Contract Manufacturers presented to the Court, in a slide deck, two examples of provisions "where it actually makes a difference in terms of whether the patents are infringed." Dkt No. 162 at 93. The Court is not persuaded that either of these references even remotely shows that a declaratory judgment as to the nine Additional Patents-in-Suit would affect the legal relations between the parties. Slide 37 indicates that [redacted text] the unit sold per the royalty provision, includes a broad reference to Qualcomm's intellectual property. *See* Chong Declaration, Ex. 2, Dkt. 73, Case No. 17-cv-1010. Slide 38 states that for Invalid or Expired Patents the [redacted text] *See* Wu Declaration, Ex. 2, Dkt. 73, Case No. 17-cv-1010 (emphasis added). The relevant declaratory judgment request involves only the Nine Additional Patents-in-Suit and accordingly, any declaration as to these patents' invalidity or noninfringement necessarily could not involve "[redacted text]" licensed. The Court also observes that the Contract Manufacturers' assert that the "SULA provisions do *contemplate* the invalidity or non-infringement of the Licensed Patents." Whether a provision contemplates invalidity or noninfringement is not the same as royalties being *contingent* on invalidity or noninfringement.

The Contract Manufacturers also argued at oral argument that *Verance* had "clearly been trumped" by the Federal Circuit's decision [19] in *Powertech v. Tessera*, 660 F.3d 1301 (Fed. Cir. 2011). The Court observes that the holding in *Powertech* is limited to legal disputes that require contract interpretation. [20] Here, the Contract Manufacturers have not met their burden to establish a dispute as to contractual interpretation that under *Powertech* would be sufficient to defeat a motion to dismiss and establish declaratory judgment jurisdiction. The Court recognizes that the Federal Circuit does not approve of contract interpretation at the motion to dismiss stage. *See* *Powertech Technology Inc. v. Tessera, Inc.*, 660 F.3d 1301, 1309 n.7 (Fed. Cir. 2011). Unlike in the reversed *Powertech* district court decision—where the parties presented developed legal arguments requiring contract interpretation to determine issues involving legal necessity and patent misuse—neither party has presented anything close to complex legal arguments necessitating

any contract interpretation. As the CM's (or Qualcomm for that matter) have not raised genuine issues of contract interpretation, the Court's decision does not rely on the interpretation of any contractual provisions in the SULAs, but rather merely looks at the plain language of the agreements that the CMs provided for the Court's review in a manner similar to the review the Supreme Court performed in *MedImmune. See* 549 U.S. at 121 (citing language of License Agreement in case reviewing a motion to dismiss).

*See also Miotox*, 2015 WL 2084493, at *4; *Verance*, 2011 WL 2182119, at *6 n.4.

**\*22** Ultimately, the Court concludes that the Contract Manufacturers have not met their burden to establish that a declaratory judgment issued by this Court as to the Nine Additional Patents-in-Suit would redress an adverse legal interest between the CMs and Qualcomm. The Contract Manufacturers, in their complaint, opposition, and at oral argument, have not articulated a theory as to how a declaratory judgment would finally and conclusively resolve the underlying controversy between the CMs and Qualcomm —a dispute centered on royalties. The Court is not persuaded that a declaratory judgment as to only nine patents in a portfolio of thousands would affect this legal relationship. Indeed, whether a declaratory judgment affects the legal relationship between the CMs and Qualcomm is particularly questionable given the limited number of patents at issue in comparison with the larger portfolio of thousands of patents that are licensed under the agreement. *Compare Miotox*, 2015 WL 2084493, at *2 (three patents); *MedImmune*, 549 U.S. at 121 (two patents) with *Verance*, 2011 WL 2182119, at *1 (twenty-two challenged patents in a patent portfolio of more than 500 patents).

Accordingly, any declaratory judgment as to the Additional Patents-in-Suit would not "finally and conclusively resolve" the underlying controversy between the CMs and Qualcomm, nor would any relief "admi[t] of specific relief through a degree of a conclusive character." *See* *MedImmune*, 549 U.S. at 127, 128 n.7 (citing *Calderon v. Ashmus*, 523 U.S. 740, 749 (1998) and *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937)). Because the royalty rates in the SULAs are not contingent on patent invalidity or noninfringement, there is no case or controversy because any declaration of the Nine Additional Patents-in-Suit would not conclusively resolve the dispute regarding royalties owed to Qualcomm.

Case 4:23-cv-01789   Document 21-3   Filed on 06/28/23 in TXSD   Page 20 of 23

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

*See* *Verance, 2011 WL 2182119, at \*7* ("the License Agreement is not contingent on the validity of the patent and, thus, a declaration of invalidity or non-infringement would not obviate Verance's royalty obligation under its terms as a matter of federal patent law."); *Miotox, 2015 WL 2084493, at \*5* (applying similar analysis and distinguishing *Verance* where License Agreement indicated royalties were contingent on patent invalidity).

The Court **GRANTS** Qualcomm's Motion to Dismiss the Contract Manufacturers' Counterclaims regarding the Additional Patents-in-Suit. The Court will grant leave to amend as any attempt to cure the pleading's deficiencies would not be futile. *See* *DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992).* Any amended pleading should identify how a favorable declaratory judgment determination as to the Additional Patents-in-Suit would actually affect the legal relationship between the CMs and Qualcomm.

### C. Discretion

The Court would decline to entertain the declaratory judgment action as to the CM's even if the Court were to find that subject matter jurisdiction existed. Even if the suit satisfies subject matter jurisdictional prerequisites, federal district courts maintain discretion to determine whether or not to entertain a Declaratory Judgment action. *Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995).* The discretion afforded to district courts to administer the declaratory judgment practice is broad. *Id.* at 287; *Sony Elecs., Inc. v. Guardian Media Techs., Ltd., 497 F.3d 1271, 1288 (Fed. Cir. 2007).* However, there must be a well-founded reason for declining to entertain a declaratory judgment action. *Capo, Inc. v. Dioptics Medical Products, Inc., 387 F.3d 1352, 1355 (Fed. Cir. 2004); SanDisk Corp. v. STMicroelectronics, Inc., 480 F.3d 1372, 1383 (Fed. Cir. 2007).* "When there is an actual controversy and a declaratory judgment would settle the legal relations in dispute and afford relief from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not subject to dismissal." *Electronics for Imaging, Inc. v. Coyle, 394 F.3d 1341, 1345 (Fed. Cir. 2005).*

"The reason for giving this discretion to the district court is to enable the court to make a reasoned judgment whether the investment of judicial time and resources in a declaratory action will prove worthwhile in resolving a justiciable dispute." *Minn. Mining & Mfg. Co. v. Norton Co., 929 F.2d 670, 672 (Fed. Cir. 1991).* "Situations justifying exercise of the court's discretion to issue a declaratory judgment include '(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.' " *Id.* at 672–73 (citing Borchard, Declaratory Judgments, 2d ed. 1941, 299).

**\*23** The Court will "decline to invest judicial time and resources in a declaratory action" that requests only piecemeal relief that does not resolve the disputes between the party in a worthwhile way.[21] *Takeda Pharm. Co. v. Mylan Inc., 62 F. Supp. 3d 1115, 1126 (N.D. Cal. 2014).* As stated above, a finding of invalidity or noninfringement as to the Additional Patents-in-Suit would not affect the legal relationship between the CMs and Qualcomm. Accordingly, the Court will decline to exercise discretion to allow the Additional Patents-in-Suit with regard to the CMs as doing so would neither serve a useful purpose in clarifying and settling the legal relations at issue, nor would it afford relief regarding the basis of the royalty rates that are unrelated to validity and noninfringement.

### CONCLUSION AND ORDER

For the foregoing reasons, the Court will hereby:

- (1) **GRANT in part and DENY in part Apple's Motion to Dismiss Count X of Qualcomm's Counterclaims with Leave to Amend [Dkt. No. 77]**

- (2) **GRANT Qualcomm's Motion to Dismiss the Additional Patents-in-Suit in Apple's First Amended Complaint with Leave to Amend [Dkt. No. 100]**

- (3) **GRANT Qualcomm's Motion to Dismiss the Additional Patents-in-Suit in the Contract Manufacturers' Counterclaims with Leave to Amend [Dkt. No. 116, Case No. 17-cv-1010]**

- Any Amended Pleadings shall be filed within **thirty days after this order is docketed.**

**IT IS SO ORDERED.**

Case 4:23-cv-01789   Document 21-3   Filed on 06/28/23 in TXSD   Page 21 of 23

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

**All Citations**

Not Reported in Fed. Supp., 2017 WL 5985598

## Footnotes

1   Defendants and Counterclaimants in the pre-consolidation '1010 action are Compal Electronics, Inc. ("Compal"), FIH Mobile Ltd. and Hon Hai Precision Industry Co. (together "Foxconn"), Pegatron Corporation ("Pegatron"), and Wistron Corporation ("Wistron") and will be collectively referred to as the "Contract Manufacturers" or "CM's."

2   This document was filed after the case was consolidated and therefore appears in the docket for the lead case 3:17-cv-00108-GPC-MDD.

3   On July 21, 2017, Qualcomm filed its Answer to Apple's First Amended Complaint, which included its First Amended Counterclaims. Dkt. No. 97. Qualcomm reasserted its Counterclaims as stated in the Answer filed in Dkt. No. 70. *Id.* at 75.

4   Apple asks the Court to take judicial notice of an article quoted in Qualcomm's Counterclaims titled *Apple's Chip Choices May Leave Some iPhone Users in Slow Lane*. RJN, Dkt. No. 77-2 (requesting judicial notice of Schlabach Decl., Ex. 1). Qualcomm argues that this request should be denied as moot because Apple has misconstrued their UCL claim as a fraud-based claim. Opp-1 at 9. The Court will take judicial notice of this document. *See* 🚩 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007) ("the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn.").

5   The heightened pleading requirement of 🚩 Rule 9(b) does not apply as to this theory. *See* 🚩 *Vess*, 317 F.3d at 1104.

6   In the 2007 case *Lozano*, the Ninth Circuit declined to apply the FTC test in the "absence of a clear holding from the California Supreme Court." 🚩 504 F.3d at 736. This Court will accordingly decline to apply the three-pronged test contained in the FTC Act. *See id.* The Court recognizes that some district courts have found the FTC test provides useful guidance in the consumer context. *See Zuniga v. Bank of America N.A.*, No. Cv 14-06471-MWF, 2014 WL 7156403, at *6 (C.D. Cal., Dec. 9, 2014) ("the Court believes that *Camacho* provides the best guidance on the issue and the adapted three-prong FTC Act test should be applied to determine whether a business practice is unfair under the UCL."). However, the test appears to be of limited use in the instant case where the relevant parties are two businesses with an ongoing relationship. *See* 🚩 *Camacho v. Automobile Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006) (adopting FTC Section 5 test in part because the test is "on its face geared to consumers and is for that reason appropriate in consumer cases").

7   Qualcomm argues that Apple's unfair conduct harmed consumers by negatively impacting network efficiency and reducing data download resources, thereby harming all "who depend[ ] on the cellular industry." Counterclaims ¶ 386; Opp-1 at 18-19. Here, it is harm to Qualcomm that matters, not the harm to consumers. Given that the "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers" language usually arises in the context of consumer UCL claims, rather than a commercial supplier claim, the Court will assume that the test is meant to assess the harm to the primary victim of the alleged unfair conduct.

Case 4:23-cv-01789   Document 21-3   Filed on 06/28/23 in TXSD   Page 22 of 23

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

Qualcomm appears to agree that its harm as a supplier because of any impact on consumer demand is the relevant inquiry here. Dkt. No. 162 at 51-52.

8    The Court recognizes that California Courts have stated that the determination of whether conduct is unfair "usually cannot be made on demurrer." *McKell*, 142 Cal. App. 4th 1457, 1473. However, the Court's conclusion that the threat not to do business theory does not state a claim under the unfair competition law represents a conclusion of law rather than the sort of factual finding that cannot be resolved by a motion to dismiss. *See Gregory*, 104 Cal. App. 4th at 857. *See also Bardin*, 136 Cal. App. 4th at 1271 n.6 (affirming dismissal at demurrer stage where complaint was devoid of facts that showed "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers"). In addition, in federal court the plaintiff must meet higher pleading standards under *Twombly* and *Iqbal* to state a claim for relief that is "plausible" on its face. *Ashcroft v. Iqbal*, 556 U.S. at 678. With regard to Apple's alleged marketing campaign threat, Qualcomm does not allege any well-pleaded facts sufficient to support the theory.

9    Apple's citation to *Aspex Eyewear, Inc. v. Vision Services Plan*, 389 Fed.Appx. 664, 666 (9th Cir. 2010) similarly does not show that the legislature has "clearly permit[ted]" threats similar to Apple's conduct. An unpublished memorandum disposition, even if persuasive, does not establish what the legislature "clearly permits." Similarly, Apple has not shown that any First Amendment right to commercial speech under *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 69 (1983) would "clearly permit" a retaliatory marketing campaign.

10    Federal Circuit law governs the inquiry into the existence of a declaratory judgment "case or controversy." *MedImmune, Inc. v. Centocor, Inc.,* 409 F.3d 1376, 1378 (Fed. Cir. 2005), *overruled on other grounds,* 549 U.S. 118 (2007); *Applera Corp. v. Michigan Diagnostics*, 594 F. Supp. 2d 150 (D. Mass. 2009).

11    Apple cites to *HP*, 587 F.3d at 1362 for the proposition that "[t]he purpose of a declaratory judgment action cannot be defeated simply by the stratagem of a correspondence that avoids the magic words such as 'litigation' or 'infringement.' " While the Court recognizes this principle, a holistic look at the licensing correspondence does not indicate, in the Court's view, threatening language from Qualcomm.

12    Qualcomm has also filed suit against Apple in an International Trade Commission case. This case similarly does not assert the Additional Patents-in-Suit and the Court will similarly afford minimal weight to this suit. *See* Opp-2 at 14 n.9.

13    The Court observes, as Apple suggests, that this case was decided under the "reasonable apprehension" standard. Nonetheless, this case continues to have persuasive value as a factually analogous case and because "reasonable apprehension" may still be considered under the *MedImmune* test.

14    The Contract Manufacturers are indemnified by Apple. *See, e.g.*, Case No: 17-cv-1010, Dkt. Nos. 66-79 (third party complaints by the CMs impleading Apple as a Third Party Defendant on the basis of indemnification).

15    Qualcomm also argues that the CMs have not adequately alleged that all of the Additional Patents-in-Suit are actually covered by the SULAs. Qualcomm argues that many of the SULAs are likely "not licensed" if the CM's allegations are taken as true. Under the SULAs, a patent is licensed if it is [redacted text] Reply-3 at 5. The Court finds this argument unpersuasive as it relies on the assumption that the Additional Patents are not standard essential. Indeed, Qualcomm has denied the allegations that each patent was not essential. *See, e.g.*, Dkt. No. 117 ("Qualcomm denies the allegations in Paragraph 561").

Case 4:23-cv-01789   Document 21-3   Filed on 06/28/23 in TXSD   Page 23 of 23

In re Qualcomm Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 5985598

16    Pursuant to the License Agreement, Verance had agreed to pay Digimarc royalties for a "worldwide, non-exclusive, nontransferable ... non-sublicensable license under the Licensed Digimarc Patents to make, have made, use, import, sell and offer to sell Licensed Products and Services within the Fields of Use." Licensed Digimarc Patents encompassed "all patents issued, patent applications filed and patent claims owned by Digimarc" as of April 2002. Licensed Products and Services were specific Verance products "developed by or for Verance and as to which right, title and interest are primarily owned by Verance." *Id.* at *1. The court observed that no provision made royalty payments contingent on validity or noninfringement. *Id.*

17    In *MedImmune* the language of the relevant license required petitioner to pay royalties on sales of "Licensed Products," a term defined as a specified antibody where "the manufacture, use or sale of which ... would, *if not licensed* under th[e] Agreement, *infringe* one or more claims of either or both of [the covered patents] which have *neither expired nor been held invalid* by a court or other body of competent jurisdiction from which no appeal has been or may be taken."  *MedImmune*, 549 U.S. at 122 (emphasis added).

18    Royalties under that license were determined by Net Sales, which were defined in part by the "Licensed Product" definition. *Id.*

19    Further, *Powertech* does not reverse the basic premise of *Verance* that no declaratory judgment jurisdiction exists—because the legal relationship between the parties is not affected—when royalty payments are not contingent on patent invalidity or noninfringement. Indeed, in a post-*Powertech* decision issued in May 2015 the Court in *Miotox* cited both *Verance* and *Powertech* to assess whether the license agreement in that case was contingent on patent invalidity and infringement. While it is true that *Verance* included a citation to the district court decision in *Powertech* as an example of a case finding that the license was not contingent, its rationale was not based merely on the district court decision in *Powertech*, but rather on years of caselaw emphasizing that declaratory judgment jurisdiction should only be brought where the dispute "touch[es] the legal relations of the parties having adverse legal interests."  *Verance*, 2011 WL 2182119, at *3, 6 (citing  *MedImmune*, 549 U.S. at 127).

20    In *Powertech*, whether royalty payments were tied to patent coverage or patent validity turned on legal disputes requiring contract interpretation. *Id.* at 1309. *See also*  *Powertech*, 2010 WL 2194829, at *3 (district court decision interpreting the term "hereunder" in the license agreement and declining to consider parole evidence). Specifically, Powertech argued that legal necessity compelled an interpretation that royalty payments would be tied to patent coverage or patent validity and that it would be patent misuse to require payment on royalties that did not infringe. *Id.* The Federal Circuit declined to address the issue leaving this "merits-based argument" to the district court to consider on remand.

21    Qualcomm has not challenged declaratory judgment jurisdiction as to the nine Original Patents-in-Suit. *See* Dkt. No. 162 at 72, 78. As a result, unlike in other cases where the declaratory judgment decision was an all-or-nothing determination, here the nine Original Patents-in-Suit will still be litigated in this Court. A claim construction hearing has been set for March 22, 2018.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.