United States District Court
Southern District of Texas

**ENTERED**

September 29, 2025

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION\**

| | | |
|---|---|---|
| HALLIBURTON ENERGY SERVICES, INC., | § § § | |
| *Plaintiff,* | § § | |
| VS. | § | CIVIL ACTION NO. 4:23-cv-1789 |
| | § | |
| GRANT PRIDECO, INC., NOV, INC., et al, | § § | |
| *Defendants.* | § § § | |

**SEALED ORDER**

Pending before the Court are two dueling motions for summary judgment on the question of whether the License Agreement in this case violates the principle laid out in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964). NOV filed its Motion for Summary Judgment, (Doc. No. 191), to which Halliburton responded, (Doc. No. 212), and NOV replied. (Doc. No. 223). Halliburton then filed its Motion for Summary Judgment, (Doc. No. 196), to which NOV responded, (Doc. No. 206), and Halliburton replied. (Doc. No. 225). NOV's Motion for Summary Judgment is **DENIED**. (Doc. No. 191). Halliburton's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. (Doc. No. 196).

## I.    Background

The dispute in these motions boils down to one ultimate question: does the License Agreement require royalties to be paid for the practice of expired patents in violation of *Brulotte v. Thys Co.*, 379 U.S. 29 (1964)?[1] NOV argues that *Brulotte* does not prohibit the royalty payments required by the License Agreement because the existence of unexpired patents, whether practiced

---

[1]    The Court laid out an extensive background of this suit's parties, factual contentions, and legal claims in its prior Order denying partial summary judgment. (Doc. No. 199 at 1–6). As such, the Court will limit the background and context to that which is necessary for the analysis here.

or not, supports the payment of the royalty until all Licensed RH Patents have expired. Conversely, Halliburton argues that the License Agreement requires Halliburton to pay a royalty for the practice of expired patents because the unexpired patents are not practiced in the manufacturing and sale of the drill bits covered by the License Agreement. Both parties seem to agree that, for the purpose of these motions, there is no evidence showing that Halliburton practices any Licensed RH Patent other than those known as the "12 Core Patents."[2] The parties also agree that all of the 12 Core Patents have expired. As such, the parties' sole disagreement in this motion is whether the existence of unexpired, but unpracticed, Licensed RH Patents exempts a continuing royalty obligation from violating the principle of patent misuse laid out by the United States Supreme Court in *Brulotte*.

In summary, the License Agreement grants a blanket license allowing Halliburton to use NOV's leaching technology in exchange for a royalty throughout the duration of the Agreement. The License Agreement's duration provision states that the Agreement terminates "upon the expiration date of the last of the Licensed RH Patents." (Doc. No. 75-7 at 20). Since the License Agreement's execution, however, NOV obtained two additional patents (the "'534 patent" & the "'752 patent"). While these two patents did not exist at the time the License Agreement was signed, the definition of "Licensed RH Patents" contemplates patents with applications pending and any later issued patents that contained independent claims relating to the leaching of PCD elements. (*Id.*). Thus, while the original category of Licensed RH Patents included only the 12 Core Patents, the portfolio of Licensed RH Patents may now include patents beyond the original 12 Core

---

[2]    These patents include U.S. Patent Nos. 6,861,098, 6,861,137, and 6,878,447 ("Thermal Characteristic Patents"), U.S. Patent No. 6,601,662 ("Impact Strength Patent"), and U.S. Patent Nos. 6,585,064, 6,589,640, 6,749,033, 6,544,308, 6,562,462, 6,592,985, 6,739,214, and 6,797,326 ("Other Core Patents").

NOV does not outright concede that Halliburton does not practice the unexpired Licensed RH Patents. Nevertheless, NOV puts forth no evidence nor does it even suggest that Halliburton does practice any of the unexpired patents. As such, for the purposes of resolving these motions, NOV has effectively acknowledged that Halliburton does not practice any unexpired patent.

Patents.[3] All parties agree that the last of the 12 Core Patents expired in October of 2021 and that the '534 Patent and '752 Patent expire in 2025 and 2031 respectively.

In this case, Halliburton seeks: (1) a declaratory judgment of non-infringement of Defendants' '534 patent; (2) a declaratory judgment of non-infringement of Defendants' '752 patent; (3) a declaratory judgment that Halliburton does not owe any royalties after the expiration of the 12 Core Patents, (4) a declaratory judgment that the 12 Core Patents are expired and that all royalty obligations are therefore suspended after October 22, 2021; and (5) a declaratory judgment of no breach of contract related to its decision not to pay more royalties under the Patent License Agreement.[4] In its answer, NOV denied Halliburton's claims and filed several counterclaims.

Previously, the Court held, as to Halliburton's Count IV, that the License Agreement did *not* tie the royalty obligation to the life of any one patent. (Doc. No. 199 at 24). Here, the motions primarily concern the Court's interpretation of the License Agreement's royalty provision and how that royalty structure comports (or does not comport) with the United States Supreme Court's opinion in *Brulotte* that delineated a category of patent misuse. *See* (Doc. No. 196 at 7); (Doc. No. 191 at 6). In Count III of Halliburton's Complaint, Halliburton seeks a declaration that it does not owe any royalties based on the Licensed Halliburton Drill Bits after the expiration of the 12 Core Patents because such a royalty would violate the dictates of *Brulotte*. Now that the 12 Core Patents—the only subset of Licensed RH Patents that Halliburton practices based on the evidence

---

[3]    While there may be some controversy between the parties as to whether the '534 and '752 patents qualify Licensed RH Patents, that question is not before the Court here and the Court presumes them to be for the narrow purpose of considering the motions for summary judgment on this claim.

[4]    This case has a companion suit ("the Schlumberger Suit") that is currently consolidated for discovery purposes. The Schlumberger Suit concerns the same patents and materially identical licensing agreements. In 2009, ReedHycalog entered into a License Agreement with Schlumberger ("Schlumberger License") which provided Schlumberger a non-exclusive license to use the leaching technology.

presented in this motion—have all expired, Halliburton argues that any royalty obligations under the License Agreement that survive the expiration of the 12 Core Patents is *per se* patent misuse.

NOV filed a Motion for Summary Judgment on Halliburton's Count III. (Doc. No. 191). NOV argues that the License Agreement does not violate *Brulotte* primarily because the royalty provision is fully supported by both foreign patents and Licensed RH Patents referenced in the License Agreement. The existence of these patents, NOV contends, is more than sufficient to justify the continuation of the royalty obligation. If Halliburton agreed to pay a certain royalty for the ability to use *any* of the patents, the argument goes, Halliburton cannot object to the royalty because it simply chooses not to practice the unexpired Licensed RH Patents that remain.

Halliburton's response and opposing motion for summary judgment argue that the License Agreement here presents the impermissible extension of the monopoly power created by patent rights that *Brulotte* specifically sought to prohibit. First, Halliburton argues that it is undisputed that the trigger for the royalty is a product that infringes the 12 Core Patents. Second, it contends that it is also undisputed that Halliburton does not practice any of the remaining U.S. patents that fall under the License Agreement's definition of Licensed RH Patents. Based on those facts alone, Halliburton argues, the royalty provision is predicated entirely on the practice of patents that have since expired and constitutes patent misuse.

## II.    Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location in the record, that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

III.    **Analysis**

Despite the fact that these motions present a single question of law, the complexity of the parties' arguments, the unstable nature of the case law applying *Brulotte*, and the wording of the License Agreement all coalesce to form a fairly complicated set of issues for the Court. For simplicity's sake, the Court's analysis will proceed in five parts. First, the Court walks through the current legal landscape of *Brulotte* and the cases interpreting and applying its holdings. Second, the Court revisits the important provisions of the License Agreement. These provisions were previously analyzed in detail in the Court's previous summary judgment order. *See* (Doc. No. 199). Third, the Court addresses whether the License Agreement's continuing royalty structure violates *Brulotte*. This section applies an objective inquiry into the License Agreement's operation as laid

5

out by the Ninth and Sixth Circuits and addresses whether the existence of unexpired patents places the Agreement outside the application of *Brulotte* and/or whether the exceptions described by the Supreme Court in *Kimble* apply in this case. *See Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446 (2015). Fourth, the Court addresses the issues raised by the possible existence of foreign patents that could support a foreign royalty. Finally, the Court explains the evidentiary burdens of each party in their respective motions and finds that the dispute concerning foreign patents raises fact issues that the Court cannot decide based on the record currently before it.

### A. The Controlling Precedents

The Constitution empowers Congress to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Under 35 U.S.C. § 154(a)(1) ("The Patent Act"), "[e]very patent shall contain . . . a grant to the patentee . . . of the right to exclude others from making, using, offering for sale, or selling [his] invention." This right to exclude is limited in important respects. As relevant here, the right lasts for a limited duration—20 years—after which the public is free to use the invention. *Id.* § 154(a)(2).

#### 1. Brulotte

The first, and most crucial, Supreme Court opinion relevant here is *Brulotte v. Thys Co.*, 379 U.S. 29 (1964). In *Brulotte*, the Supreme Court held that patent holders may not contract for royalties on the use of a patented invention that occurs after the patent has expired. *Id.* at 32. In that case, purchasers had each acquired a hop-picking machine in exchange for both a "flat sum" and a seasonal "license for its use." *Id.* at 29. The seasonal license payment was calculated as the greater of either "a minimum royalty of $500 for each hop-picking season or $3.33 1/3 per 200 pounds of dried hops harvested by the machine." *Id.* The licenses referred to twelve patents, only

seven of which "were incorporated into the machines." *Id.* at 30. "Of those seven all expired on or before 1957. But the licenses . . . continued for terms beyond that date." *Id.* The purchasers "refused to make royalty payments accruing . . . after the expiration of the patents." *Id.* The Supreme Court held that "any attempted reservation or continuation in the patentee . . . after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws." *Id.* at 31 (quoting *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256 (1945)). Thus, the agreements were invalidated, "insofar as it allow[ed] royalties to be collected which accrued after the last of the patents incorporated into the machines had expired." *Id.* The Court reasoned that "there is intrinsic evidence that the agreements were not designed" merely to "spread the payments for the use of the patent" over "a reasonable amount of time." *Id.* (quotation marks omitted). The Court explained that, because the licenses drew "no line between the term of the patent and the post-expiration period," the "contracts [were] . . . on their face a bald attempt to exact the same terms and conditions for the period after the patents have expired" as it did for the period before the patents expired. *Id.* at 32.

### 2.  *Post-*Brulotte

The Court's opinion in *Brulotte* was immediately and almost universally maligned.[5] Nevertheless, forty years later, the Supreme Court rejected an attempt to overturn *Brulotte* in

---

[5]     *See* Comment, *Validity of Patent License Provisions Requiring Payment of Post-Expiration Royalties*, 65 COLUM. L. REV. 1256, 1270 (1965) ("Notwithstanding these difficulties, the per se rule, in light of the harm sought to be redressed and the potential restraints upon common commercial practices, remains an inordinately severe judicial sanction."); *see also* The Supreme Court, 1964 Term, *Patent Law Royalty Agreements Projecting Beyond Expiration of Patent*, 79 HARV. L. REV. 199, 201 (1965) ("It is arguable that any royalty arrangement should be acceptable as long as no one is prevented from obtaining the *idea* without charge after the patent has expired."); William F. Baxter, *Legal Restrictions on Exploitation of the Patent Monopoly: An Economic Analysis*, 76 YALE L.J. 267, 357 (1966) ("In a careless opinion, Mr. Justice Douglas held invalid a license under which royalties continued to accrue after the expiration of the patents. He made no attempt to reply to the dissent's plausible but erroneous assertion that the economic consequences of the two types of arrangements were the same.").

*Kimble*, 576 U.S. at 446. Acknowledging a "broad scholarly consensus" against the economic assumptions made in *Brulotte*, *id.* at 461, the Court nevertheless concluded that overruling *Brulotte* was not justified—primarily based on the doctrine of *stare decisis*. *Id.* at 465. The Court in *Kimble* stated that one reason not to overturn *Brulotte* was that the rule it created "is simplicity itself to apply. A court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Id.* at 459.

The *Kimble* Court, nevertheless, recognized the limits of *Brulotte* and noted that sophisticated "parties can often find ways around *Brulotte.*" *Id.* at 453. Parties may, for example, "defer payments for pre-expiration use of a patent into the post-expiration period" because "all the [*Brulotte*] decision bars are royalties for using an invention after it has moved into the public domain." *Id.* at 453–54. For instance, parties may agree to royalties "equal to 10% of sales during the 20-year patent term," paid over 40 years. *Id.* at 454. "[P]arties have still more options when a licensing agreement covers either multiple patents or additional non-patent rights. Under *Brulotte*, royalties may run until the latest-running patent covered in the parties' agreement expires." *Id.* And parties may agree to continuing royalties on non-patent rights that are "closely related to a patent," such as "a license involving both a patent and a trade secret" that sets "a 5% royalty during the patent period (as compensation for the two combined) and a 4% royalty afterward (as payment for the trade secret alone)." *Id.*

Numerous circuit courts have addressed *Brulotte*, albeit with some inconsistency. In *Scheiber*, the Seventh Circuit considered a license agreement that involved both American and Canadian patents. *Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1016 (7th Cir. 2002). There, the agreement "provide[d] that royalties on all the patents would continue until the Canadian patent expired, including, therefore, patents that had already expired." *Id.* The Seventh Circuit held that

8

*Brulotte* rendered unenforceable a contract provision requiring Dolby to pay royalties on domestic sales past the expiration of the last-to-expire United States patent, even though a Canadian patent remained in force. *Id.* at 1023. Later, in *Zimmer Biomet Holdings, Inc. v. Insall*, the Seventh Circuit declined to apply *Brulotte* because *Zimmer* involved a "question of contract interpretation" and the court had "no power to unwind" the arbitration panel's decisions interpreting the agreement. 108 F.4th 512, 519–20 (7th Cir. 2024). Nevertheless, the court noted that *Brulotte* only bars the enforcement of royalty obligations when the royalty is based exclusively on patent rights and not a joint agreement supporting non-patent rights as well. *Id.* at 518.

Prior to *Kimble*, the Ninth Circuit reviewed a *Brulotte* challenge to a license agreement that "provide[d] [appellee] with 'a five percent (5%) royalty on gross sales . . . of the invention.' This provision ha[d] no sunset clause, time limit, or territorial limitation." *Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1024 (9th Cir. 2007). Though an unexpired Canadian patent existed, the Ninth Circuit held that a claim for the domestic royalties would be unenforceable after the expiration of the last licensed United States patent. *Id.* at 1027. Following its reasoning in *Zila*, and post-*Kimble*, the Ninth Circuit held that a royalty agreement did not violate *Brulotte* because there was a clear demarcation between the royalties owed under United States patents, the royalties owed under Canadian patents, and the imposition of a minimum royalty until all patents expired. *C.R. Bard, Inc. v. Atrium Medical Corp.*, 112 F.4th 1192–93 (9th Cir. 2024), *cert. denied*, 2025 WL 1549867 (2025). Specifically, the Ninth Circuit said that the agreement unambiguously based a portion of the royalty on the practice of United States patents and terminated that portion of the royalty at the expiration of those patents. *Id.* at 1192. It effectively held that the minimum royalty for the duration of *all* patents and the royalty based on the Canadian patents did not violate *Brulotte*. *Id.*

The Third Circuit recently came to a similar conclusion, though notably employing a different analytical approach. *See Ares Trading S.A. v. Dyax Corp.*, 114 F.4th 123 (3d Cir. 2024). In upholding a royalty provision, the Third Circuit reasoned that the royalty was "not calculated based on activity requiring postexpiration use of" the patents. *Id.* at 143. The contract in that case confirmed, and the licensee conceded, that "the definition of what products the royalty is owed on . . . does not depend in any way on using" the patents and, crucially, that any use of the patents occurred "entirely *before* expiration." *Id.* (emphasis added).

As noted, the Third Circuit analyzed the *Brulotte* issue somewhat differently than other circuits. For example, the Ninth Circuit stated that the proper approach was a formal inquiry into the terms of the agreement—that the result "does not depend on the parties' motivations, the course of their negotiations, or the consideration received by either party in exchange for the inclusion of a particular contractual term." *C.R. Bard*, 112 F.4th at 1186. The Third Circuit, however, announced a fact-intensive, three-part test:

> We understand *Kimble*'s definition of *Brulotte*'s rule as follows: (i) "post-expiration use" refers to practicing inventions after their patents expire—acts that would have infringed the patents pre-expiration; (ii) to determine whether a royalty is "provided for" post-expiration use, courts must determine whether the royalty is calculated based on activity requiring post-expiration use; and (iii) a royalty may be calculated based on activity requiring post-expiration use even if the royalty's value does not vary with that use.

*Ares Trading*, 114 F.4th at 140. The Third Circuit's approach may suggest a departure from the "formal inquiry" approach that the Ninth Circuit described in *C.R. Bard*. Rather than an objective inquiry into the agreement's operation, the *Ares* test places the focus on findings of infringement, when infringement occurred, and *then* it turns to the interpretation of the contract at issue.

Most recently, the Sixth Circuit reviewed a similar license agreement. *See Lavery v. Pursuant Health, Inc.*, 126 F.4th 1170 (6th Cir. 2025). In an opinion by Chief Judge Sutton, that court reviewed a royalty agreement that gave the licensee rights to the inventor's "intellectual

property" "in exchange for a 1% cut on domestic sales of its 'vision screening kiosks and any derivative or complementary applications,' to be bumped to 3% if [licensee] sold kiosks with [an additional patent]." *Id.* at 1173. The Sixth Circuit held that the license created a perpetual royalty based on the use of the patented device. *Id.* at 1176. Further, the Court noted that while the agreement made reference to "other intellectual property," it did not reference any specific IP or non-patent rights. *Id.* Citing *Kimble*, the Sixth Circuit held that, "[w]hile inventors remain free to seek compensation for non-patent rights that extend beyond a patent's expiration date . . . they must identify them in the contract. In this instance, however, the contract does not contain any cognizable indication that the royalty covered anything other than [the licensor's] patent." *Id.* Determining that the agreement created a perpetual royalty for the use of a product embodying the licensor's patent, the Sixth Circuit held that the agreement violated *Brulotte* and *Kimble*, and thus constituted patent misuse. *Id.* at 1178.

While the Fifth Circuit has not substantively considered *Brulotte* since 1976—and even then only gave it four sentences of dicta—several district courts within the Fifth Circuit have addressed it since *Kimble*.[6] Most of these cases are factually distinguishable and, consequently, provide little guidance here. *See, e.g.*, *Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 598 F. Supp. 3d 520, 530 (S.D. Tex. 2022) (denying summary judgment because insufficient evidence supported a finding that all relevant patents had actually expired). One case, however, aligned itself with the Ninth Circuit's analytical approach to *Brulotte*. *See Nautilus, Inc. v. ICON Health & Fitness, Inc.*, 304 F. Supp. 3d 552, 568 (W.D. Tex. 2018), *amended*, No. SA-16-CV-00080-RCL, 2018 WL 2107729 (W.D. Tex. May 7, 2018), *and aff'd*, 754 Fed. Appx. 292 (5th Cir.

---

[6]    *See In re Yarn Processing Patent Validity Litig.*, 541 F.2d 1127, 1140 (5th Cir. 1976) (comparing the royalties in the case to those in *Brulotte*); *Pipkin v. FMC Corp.*, 427 F.2d 353, 357 (5th Cir. 1970); *Hensley Equip. Co. v. Esco Corp.*, 383 F.2d 252, 264 (5th Cir. 1967).

2019) ("This Court wholly agrees with the Ninth Circuit's reasoning. Texas contract law is fully competent to dispose of the rights and obligations owing under the contract as it pertains to the Chinese patent. *Brulotte* has nothing to say on the matter."). In *Nautilus*, the court considered a challenge to a license agreement that required a royalty when certain products were sold in the United States based on a Chinese patent. *Id.* at 567. The *Nautilus* court rejected that argument, citing *Zila*, because *Brulotte* does not preclude parties from contracting to pay royalties based on *foreign* patents after they expire. *Id.* at 568.

While each of the varied approaches appear to have some merit, the Court determines that the "formal inquiry," legal-question approach used by the Ninth and Sixth Circuits is more aligned with the language in *Brulotte* and *Kimble*. As such, this Court will consider whether the License Agreement here objectively requires the payment of a royalty based on the practice of an expired patent.

**B. The License Agreement's Royalty Structure**

Applying *Brulotte* here requires a refresher on how exactly the License Agreement operates. As the Court noted in its earlier summary judgment order, (Doc. No. 199), the principal provision is § 6.01(b)—titled "Go-Forward Royalty Beginning on July 1, 2008." (Doc. No. 75-7 at 12). This provision has been recognized by both parties as being the most crucial for determining whether royalty payments were tied to the practice of specific patents or not. This provision, in full, reads as follows:

> Beginning on July 1, 2008, Halliburton will owe to ReedHycalog, on a quarterly basis, <u>a go-forward royalty based upon Halliburton's Net Price of Licensed Halliburton Drill Bits invoiced on a worldwide basis to a third-party customer during the reported quarter</u>. In the event Licensed Halliburton Drill Bits invoiced to a customer are returned as the result of a defect or customer return such that Halliburton does not receive revenue with respect to the invoiced Licensed Halliburton Drill Bits, Halliburton shall apply a credit for the amount of royalty paid to ReedHycalog, if any, regarding such Licensed Halliburton Drill Bits. The Parties agree that the royalties Halliburton is to pay to ReedHycalog depends upon the Leach depth of the PDC's Halliburton employs on its Licensed Halliburton Drill Bits . . . .

§ 6.01(b) (emphasis added). As "Licensed Halliburton Drill Bits," as used in the royalty provision,

is a defined term under the License Agreement, a full understanding of § 6.01(b) also requires

consideration of the provision's antecedent definition, provided in § 2.04. (Doc. No. 75-7 at 2).

Section 2.04, in relevant part, reads as follows:

> Licensed Halliburton Drill Bits: "Licensed Halliburton Drill Bits" means any and all PCD
> Bits (as defined herein) manufactured, sold, used, rented, leased and/or marketed by or for
> Halliburton . . . containing at least one PCD element and/or PDC Cutter (which are
> considered separately licensed as well) which further contains:
> (a)     A non-leached region that is not substantially free of catalyzing material; and
> (b)     Any one or more of the following characteristics . . . .

The latter half of the § 2.04 definition, omitted here, is lengthy and technical, but, in essence, states

that Licensed Halliburton Drill Bits are those that contain non-leached regions and other regions

leached to varying depths. It then provides four other sets of technical characteristics that would

qualify a product as a "Licensed Halliburton Drill Bit." Importantly, the Court's previous order

interpreted the unambiguous language of § 6.01(b) and § 2.04 to make the royalty obligation

contingent solely on the sale of Licensed Halliburton Drill Bits and continuing until the termination

of the License Agreement. (Doc. No. 199 at 10).

The next provision of some importance here is § 2.05, which defines what constitutes a

Licensed RH Patent. According to the License Agreement, a Licensed RH Patent means:

> All U.S. patents and patent applications listed on Exhibit C and all foreign
> counterpart patents and patent applications, and all continuations, continuations-in-part,
> divisionals, reissues, reexaminations, and term extensions thereof; otherwise related
> applications or patents to the extent ReedHycalog has any interest in such an application
> or patent . . . Licensed RH Patents also includes any current or later-issued ReedHycalog
> patent (i) having an independent claim relating to the Leaching of PCD elements, which
> was filed on or before the Effective Date of this Agreement or claims a priority date on or
> before the Effective Date of this Agreement (in which case any license granted hereunder
> shall be limited to such dependent claims provided all claims from which such claims
> depend are invalid or unenforceable), in each case which was filed on or before the
> Effective Date of this Agreement or claims a priority date on or before the Effective Date
> of this Agreement.

(Doc. No. 75-7 at 5) (emphasis added). The import of this provision is that "Licensed RH Patents"

can include patents that were not listed in the License Agreement because they had not yet been

granted. Thus, the "12 Core Patents" refers to the United States patents explicitly listed in the License Agreements, but the License Agreement contemplates that later-issued patents could be added to the Agreement as well. This language is the basis for NOV's argument that the '534 and '752 patents—which were issued after the Licensed Agreement was signed and are, therefore, *not* included in the 12 Core Patents—are nevertheless unexpired Licensed RH Patents.

Finally, the termination provision of the License Agreement states that the License Agreement unambiguously remains in effect until the "expiration date of the last of the Licensed RH Patents," not the expiration of the 12 Core Patents. (Doc. No. 75-7 at 19); § 8.02. Thus, as the Court previously held, the License Agreement guarantees Halliburton the power to manufacture and sell Licensed Halliburton Drill Bits in exchange for a royalty and requires that royalty on each Licensed Halliburton Drill Bit until all of the Licensed RH Patents have expired. (Doc. No. 199 at 14).

In sum, after analyzing the License Agreement and the parties' arguments, this Court held that "the trigger of the royalty obligation is whether the product sold is a 'Licensed Halliburton Drill Bit,' and the depth of the leaching serves to determine the royalty rate applied to each sale." (Doc. No. 199 at 9). The Court then noted that no language in the License Agreement could reasonably be construed to expressly tie the royalty obligation to the practice of patents. Rather, the royalty obligation was tied to the sale of Licensed Halliburton Drill Bits, which practiced some, but not necessarily all, of the Licensed RH Patents. (*Id.* at 12). Finally, the Court held that, under the License Agreement, royalties are owed until all Licensed RH Patents expire. (*Id.* at 13).

This Court previously found that the License Agreement tied the royalty obligation to the sale of Licensed Halliburton Drill Bits rather than the practice of any particular patent. While the

Licensed Halliburton Drill Bits are defined as practicing certain claims of the 12 Core Patents, the language of the royalty provision only references the sale of the drill bits themselves. (*Id.* at 14).

**C. Does The License Agreement Violate *Brulotte*?**

The question the Court answers here requires a substantively different inquiry than the one it performed in its previous summary judgment order. There, the Court determined how the License Agreement defined Halliburton's royalty obligation and the termination thereof by its own terms. Specifically, the Court asked whether the License Agreement terminated Halliburton's royalty obligation upon the expiration of the 12 Core Patents. The Court found that the royalty obligation was triggered any time a Licensed Halliburton Drill Bit was sold, regardless of the status of the relevant patents, and therefore the expiration of the 12 Core Patents had no impact on the royalty obligation based on the language of the License Agreement.

In this order, on the other hand, the Court must determine the objective effect, and legal consequences of, the continuing royalty obligation in light of *Brulotte*. Put another way, the Court must determine whether requiring Halliburton to pay royalties on all Licensed Halliburton Drill Bits until the "expiration date of the last of the Licensed RH Patents" effectively requires the payment of a royalty based on the practice of an expired patent. (Doc. No. 75-7 at 19); § 8.02; § 8.04(a). Paradoxically, the very interpretive arguments that helped NOV to prevail in its last motion may doom it to fail here. As explained in detail below, the Court finds that the structure of the License Agreement's royalty provision does require Halliburton to pay royalties for the post-expiration practice of expired patents.

*1.* Brulotte *Squarely Applies to the Royalty Obligation*

As stated above, the application of *Brulotte* "does not turn on the parties' motivations, the course of their negotiations, or the consideration received by either party in exchange for the

15

inclusion of a particular contractual term." *C.R. Bard, Inc. v. Atrium Med. Corp.*, 112 F.4th 1182, 1191 (9th Cir. 2024). Rather, the Court performs a "formal inquiry" that is "simplicity itself to apply." *Id.* at 1186, 1189 (citing *Kimble*, 576 U.S. at 459).

To start, all parties agree that the Licensed Halliburton Drill Bits practice various claims found in the 12 Core Patents. While the defined drill bits may not necessarily practice all of the claims disclosed in the 12 Core Patents, Halliburton has proffered undisputed expert evidence that each Licensed Halliburton Drill Bit practices at least *some* of the now-expired 12 Core Patents. *See* (Doc. No. 214-2 at 42) (Expert Report of John P. Hayes). If every Licensed Halliburton Drill Bit practices some element of the expired 12 Core Patents, and the royalty obligation is tied solely to the sale of Licensed Halliburton Drill Bits, then there can be little doubt that Halliburton is effectively paying a royalty based on the post-expiration use of expired patents. This is, undoubtedly, the sort of agreement contemplated by the Supreme Court in *Brulotte*.

A factual comparison to *Brulotte* buoys this conclusion. In *Brulotte*, there were 12 patents listed in the license agreement related to hop-picking. *Brulotte*, 379 U.S. at 30. Here, the License Agreement includes the 12 Core Patents and—arguably—at least two other Licensed RH Patents.[7] In *Brulotte*, the royalty-triggering product was a hop-picker that only practiced seven of the patents. *Id.* Here, the Court has already held that the royalty-triggering product is the sale of a Licensed Halliburton Drill Bit. Further, there is undisputed evidence that the drill bits practice the 12 Core Patents but do not practice any of the unexpired Licensed RH Patents. *See* (Doc. No. 214-2 at 42) (Expert Report of John P. Hayes). In *Brulotte*, the seven patents incorporated in the hop-picking machine—and *only* those patents—had expired, but the royalty obligation for using the

_____

[7]    While the parties do not necessarily agree about whether the '534 and '752 patents are Licensed RH Patents under the legacy provision, that question is not before the Court here, and the Court presumes them to be Licensed RH Patents for the narrow purpose of considering this motion for summary judgment.

hop-picker continued. *Brulotte*, 379 U.S. at 30. Likewise, here, the 12 Core Patents have expired, but the License Agreement requires the royalty for the use of Licensed Halliburton Drill Bits to continue during the life of the '534 and '752 patents. In *Brulotte*, just as here, the mere existence of live patents was inconsequential because the only patents practiced by the royalty-triggering product (the hop-picker) had expired. *Id.* The similarity of the facts here to those in *Brulotte* therefore becomes clear: both license agreements charged a royalty tied solely to a product that only practiced expired patents for the duration of non-practiced, unexpired patent terms.

### 2. *Unexpired Licensed RH Patents Do Not Support the Royalty*

Having concluded that *Brulotte* applies to the License Agreement, the next question is whether there is any reason to conclude that there is an interest in an unexpired patent, or a non-patent right, that legally supports the continuation of the royalty obligation. NOV argues that the existence of unexpired Licensed RH Patents gets the License Agreement "around" *Brulotte* as a matter of law. Specifically, NOV argues that the inclusion of unexpired and expired patents together in a portfolio license is precisely the kind of "way around" *Brulotte* that the United States Supreme Court approved in *Kimble*, as well as two other Supreme Court cases.[8] Halliburton obviously disagrees and argues that unexpired patents support a continued royalty only where the interest in the unexpired patents constituted part of the royalty itself.

### a. *Kimble* Does Not Insulate the License Agreement

In *Kimble*, the Supreme Court noted that there were limits to *Brulotte* and stated that sophisticated "parties can often find ways around *Brulotte*." 576 U.S. at 453. These "ways around" included "defer[red] payments for pre-expiration use of a patent into the post-expiration period,"

---

[8]    *Automatic Radio Mfg. Co. v. Hazeltine Research Inc.*, 339 U.S. 827, 833 (1950) (rejecting an argument by a licensee that royalties should cease when it stopped using the patents); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 137 (1969) (addressing an attempt by a licensor to condition the granting of a patent license on the payment of royalties for non-patented items).

or recognition that the licensing agreement *"*covers either multiple patents or additional non-patent rights," such as trade secrets or trademarks. *Id.* at 453–54. The *Kimble* Court also said, "royalties may run until the latest-running patent covered in the parties' agreement expires." *Id.*

These general statements describing potential exceptions must be understood, however, with one overriding and governing caveat—namely, that, in *Kimble*, the Supreme Court explicitly affirmed *Brulotte*. As such, when one applies *Kimble*, one is faced with the conclusion that the fact pattern in *Brulotte* still necessarily constitutes patent misuse.[9] As laid out in detail above, the facts of *Brulotte* closely track the facts of this case. For example, in *Brulotte*, there were unexpired patents covered by the license agreement, but not incorporated into the actual hop-picking machine that the license covered, and the Court found patent misuse. *Brulotte*, 379 U.S. at 30. Thus, when *Kimble* makes the broad statement that "royalties may run until the latest-running patent covered in the parties' agreement expires," 576 U.S. at 454, that statement must be understood in the context of *Brulotte* itself.

The *Brulotte* Court's finding of patent misuse was not precluded because unexpired patents existed within the license portfolio. Rather, the Court noted that the royalty obligation was for the use of the hop-picking machine, and that machine only included seven patents—all of which had expired. *Brulotte*, 379 U.S. at 31. It is not surprising that NOV points to the existence of unexpired patents as a "way[] around" *Brulotte*. *Kimble*, 576 U.S. at 453. This approach was arguably approved in *Kimble*, but such a conclusion fails to analyze that exception within the context of *Brulotte*. Patents that were unexpired, but unrelated to the royalty obligation, existed in *Brulotte*, and those unexpired patents did not prevent the Supreme Court from finding patent misuse. Thus,

---

[9]     To the extent that the general statements in *Kimble* could be construed to narrow or implicitly reject *Brulotte*, such an interpretation is beyond the discretion of this Court. As the Seventh Circuit noted, "the reaffirmation of *Brulotte* in [*Kimble*] tells us that the Court did not deem the cases inconsistent, and so, whether we agree or not, we have no warrant for declaring *Brulotte* overruled." *Scheiber*, 293 F.3d at 1019.

the mere existence of unexpired patents does not "get around" *Brulotte* when the License Agreement charges a royalty based solely on the sale of Licensed Halliburton Drill Bits, which incorporate only expired patents. The facts of *Brulotte* itself and the affirmance of *Brulotte* in *Kimble* make this clear. *See Brulotte*, 379 U.S. at 32 (noting that because the licenses drew "no line between the term of the patent and the post-expiration period," the "contracts [were] . . . on their face a bald attempt to exact the same terms and conditions for the period after the patents have expired" as for the period before the patents expired). Thus, the mere existence of unexpired patents cannot avoid *Brulotte* as a matter of law.

This Court recognizes that several courts have tended to interpret the holding in *Brulotte* narrowly and *Kimble*'s exception examples broadly, likely due to the widespread distaste for the former. *See, e.g.*, *Ares Trading S.A. v. Dyax Corp.*, 2023 WL 2456437 at *23–24 (D. Del. Mar. 10, 2023). Nevertheless, narrowing the scope of binding Supreme Court precedent without explicit permission to do so is not within this Court's power. As such, this Court applies *Brulotte* as written (and as affirmed in *Kimble*) by simply asking "whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Kimble*, 576 U.S. at 459. [10] This approach is also in line with the trend in other circuits. *See, e.g.*, *C.R. Bard*, 112 F.4th at 1194 ("The parties' agreement provides for U.S. royalties only through the expiration of the U.S. patent, so it does not constitute patent misuse under *Brulotte*."); *Lavery*, 126 F.4th at 1177 ("While *Kimble* leaves inventors with plenty of options to defer compensation or to compensate an inventor for

---

[10] While the *Kimble* Court may have found the *Brulotte* test "simplicity itself to apply," it also gave some of the best minds of the legal profession carte blanche to try to draft around the consequences of *Brulotte*. 576 U.S. at 459. These attempts to evade *Brulotte* (whether successful or not) complicate the legal landscape. Moreover, each patent, license, and subsequent dispute/lawsuit has their own unique facts, background, and circumstances that also must be considered. The result is that today the test may be simple to articulate, but its application may be somewhat more difficult than the Supreme Court anticipated.

non-patent property, it does not permit courts to re-write a contract to create a form of compensation not identified in it.").

The Court's holding here is reinforced by the Ninth Circuit's analysis in *Kimble* itself. In *Kimble*, the patent-holder settled an infringement suit with a settlement agreement, which provided that the licensee would purchase the patent in exchange for a lump sum and an ongoing royalty of 3% on both "product sales that would infringe the Patent . . . as well as sales of the [product]." *Kimble v. Marvel Enterprises Inc.*, 727 F.3d 856 (9th Cir. 2013), *aff'd sub nom. Kimble*, 576 U.S. at 465.[11] The Ninth Circuit held that under *Brulotte*, royalties on sales of a product that embodies both a patented invention and an additional interest or right, must "provide[ ] a discount for the non-patent rights from the patent-protected rate" after the patent expires. *Id.* at 863. "This is because—in the absence of a discount or other clear indication that the license was in no way subject to patent leverage—we presume that the post-expiration royalty payments are for the then-current patent use, which is an improper extension of the patent monopoly under *Brulotte*." *Id.* at 863–64; *see also C.R. Bard*, 112 F.4th at 1190 (citing the Ninth Circuit analysis in *Kimble*). The Ninth Circuit noted that the royalty rate did not decrease upon expiration of the patent and applied to the additional rights granted in the agreement "with no discount or other clear indication that the [product] royalties were not subject to patent leverage." *Kimble*, 727 F.3d at 864. The Ninth Circuit concluded that the "rights were intertwined and could not be separated in any principled manner" such that it rejected the argument that the license agreement was a "hybrid" agreement. *Id.* at 865.

---

[11]    In reviewing the Ninth Circuit's judgment in *Kimble*, the Supreme Court considered only whether to overrule *Brulotte*. 576 U.S. at 449. The Supreme Court declined to do so and therefore affirmed the Ninth Circuit's judgment. *Id.* at 465.

As mentioned above, *C.R. Bard*'s analysis supports this Court's conclusion. In *C.R. Bard*, the Ninth Circuit effectively held that the minimum royalty provision for the duration of *all* patents did not violate *Brulotte,* despite seemingly being conditioned on expired and unexpired patents, because the minimum royalty payment provision did not determine the duration of the agreement, rather it only determined the minimum royalty owed on any unexpired patents. The duration of the obligation to pay royalties was still determined by the expiration of the U.S. patents. *See C.R. Bard,* 112 F.4th at 1192 ("The licensing agreement terms unambiguously require a 15% per-unit royalty on U.S. sales *until* the expiration of the U.S. patent." (emphasis added)). Effectively, the minimum royalty provision only functioned as a minimum standard to meet during any period of payment on an unexpired patent. It did not extend payment of royalties into a period of "post-expiration use" of the U.S. patent. *Id.* The Ninth Circuit therefore noted that, because Licensee still owed royalties on other unexpired patents, the minimum royalty still applied. *Id.* Rather than a continuing royalty on expired parents, the minimum royalty was just that—a minimum that had to be paid so long as some valid royalty was owed.

In contrast, here, the License Agreement terminates upon the "expiration date of the last of the Licensed RH Patents," which are defined to include both "current or **later-issued** ReedHycalog patent[s]." (Doc. No. 75-7 at 4) (emphasis added). Thus, because the duration of the royalty obligation is conditioned on both "current" (expired) and "later-issued" (unexpired) patents, payment of royalties under the License Agreement is extended into a "post-expiration" period in violation of *Brulotte*. Unlike in *C.R. Bard* where the royalty obligation terminated upon the expiration of the last practiced patent, here the royalty obligation extends until the expiration of the last "later-issued," but unpracticed, Licensed RH Patent.

The Sixth Circuit's application of *Brulotte* and *Kimble* also reinforces this Court's analysis. In *Lavery*, the Sixth Circuit addressed the argument that the royalty could have included other intellectual property and non-patent rights like trade secrets. *Lavery*, 126 F.4th at 1176. Noting that, while "inventors remain free to seek compensation for non-patent rights that extend beyond a patent's expiration date" the Court held that "they must identify them in the contract." *Id.* Further, because the contract at issue did "not contain any cognizable indication that the royalty covered anything other than [inventor's patent]" the Sixth Circuit held that the royalty was based solely on the practice of the expired patent. *Id.* at 1176–77.

Likewise, the License Agreement bases the royalty solely on the product using the expired patents and includes no adjustment to the royalty amount after the expiration of the patents incorporated in the product. While certainly "a discounted [post-expiration] rate may not be necessary to avoid *Brulotte* in every case," the Ninth Circuit's analysis has required that "in the absence of a discounted rate, there must be some other clear indication" that the royalty was not for use of the patent after its expiration. *C.R. Bard*, 112 F.4th at 1190. (citing *Kimble*, 727 F.3d at 865). Here, there is no clear indication that the royalty is not for the sale of the Licensed Halliburton Drill Bits—which practice only the expired patents. As such, the Court does not find this License Agreement to be a "hybrid" license where the royalty turns on both practiced and non-practiced patent rights. For similar reasons, as explained below, the Court does not find the other cases cited by NOV to be particularly applicable here.

b.  The Other Cases Cited by NOV are Substantively Distinguishable

NOV points to two other Supreme Court cases—one before and one after *Brulotte*—to support its argument. Nevertheless, this Court finds *Zenith Radio* and *Automatic Radio* to be distinguishable and providing only general guidance at best for the Court's analysis here. First, in

*Automatic Radio*, the Supreme Court held that if the licensee bargains for the privilege of using the patent in all of his products and agrees to a lump sum or a percentage-of-total-sales royalty, he cannot escape payment on this basis by demonstrating that he is no longer using the invention disclosed by the patent. *Automatic Radio Mfg. Co. v. Hazeltine Research Inc.*, 339 U.S. 827, 833 (1950). Here, the royalty is predicated solely on the sale of Licensed Halliburton Drill Bits, and those drill bits are defined. Certainly, the use of other patents in additional products could support a continued royalty obligation until the License Agreement terminates—but the royalty obligation at issue here does not contemplate any product other than the Licensed Halliburton Drill Bit.

Likewise, *Zenith* is distinguishable on its facts. In that case, the Supreme Court was examining the use of a patent to leverage a licensee to pay royalties on non-patented articles. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 136 (1969). As such, the Supreme Court held that a licensor did not have "*carte blanche* authority to condition the grant of patent licenses upon the payment of royalties on unpatented articles." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 137 (1969). In this case, there is no such allegation. Thus, the Court is convinced that the facts in this case are far more analogous to the facts of *Brulotte* itself than to either *Automatic Radio* or *Zenith Radio*.

Based on the above, the Court concludes that: (1) the License Agreement requires a royalty based solely on the post-expiration use of expired patents; and (2) the unexpired Licensed RH Patents do not serve as a basis for the royalty obligation and therefore cannot shield the License Agreement from *Brulotte*'s *per se* prohibition against collecting "royalties which accrued after the last of the patents incorporated into the machines had expired." *Brulotte*, 379 U.S. at 30.

c. The Impact of Foreign Patents

The final question is whether *Brulotte*'s prohibition renders the License Agreement's royalty provision unenforceable in its entirety, or whether it only prohibits the payment of royalties based on U.S. patents. In continuing to follow the persuasive reasoning of the Ninth and Sixth Circuits, the Court finds that the use of foreign patents in a Licensed Halliburton Drill Bit could support a royalty as explained below. *See, e.g.*, *C.R. Bard*, 112 F.4th at 1192 (permitting royalties based on foreign sales of products incorporating the foreign patents).

As a matter of law, *Brulotte*'s *per se* prohibition does not apply to foreign patents. *Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1023 (9th Cir. 2007). The Court finds support for this holding from both the Ninth Circuit and Western District of Texas. First, in *Zila, Inc.*, the Ninth Circuit analyzed a 5% perpetual royalty that continued after the U.S. patents expired. *Id.* at 1017. When assessing whether the royalty violated *Brulotte*, the Ninth Circuit held that *Brulotte* had no effect Zila's obligation to pay royalties for use of the Canadian patent because *Brulotte* does not "extend its royalty-canceling powers to contracts for foreign patents." *Id.* at 1023. The Court did hold, however, that *Brulotte* prohibited the payment of U.S. royalties after the expiration of the final U.S. patent and remanded for the district court to resolve a factual dispute related to whether the final U.S. patent had already expired. *Id.* at 1025–27. Citing *Zila, Inc.*, the District Court for the Western District of Texas likewise held that *Brulotte* did not apply to foreign patents. *See Nautilus*, 304 F. Supp. 3d at 568. As such, if the Licensed Halliburton Drill Bits practice unexpired foreign patents, those patents could support a royalty. This question, however, raises the specter of a fact issue. While the parties do not dispute that unexpired foreign patents exist, it is unclear if the parties disagree about whether the Licensed Halliburton Drill Bits incorporate any foreign patents. The

Court does not have a sufficient record to resolve any further issues involving the application of foreign patents to the disputes in this case.

Nevertheless, the Court does find it appropriate to address one more ongoing dispute. Due to the parties' dueling motions, the question of evidentiary burdens is a little foggier than usual. Traditionally, in a summary judgment context, once the movant has sufficiently raised an issue, the burden shifts to the non-movant to demonstrate that the movant is either legally wrong or there is a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 322–25. Here, NOV argues that Halliburton has the burden to provide evidence to show that it does not practice the foreign patents, and that Halliburton has failed to meet that burden. (Doc. No. 223 at 10). Similarly, Halliburton argues that NOV's failure to provide evidence that Halliburton practices any foreign Licensed RH Patent is fatal to NOV's motion. (Doc. No. 214 at 15). Interestingly, both positions are partially right.

NOV moved for summary judgment on the *Brulotte* issue first. (Doc. No. 191). In that motion, NOV has the burden to show that, as a matter of law, *Brulotte* does not render the License Agreement's royalty provision patent misuse. *See* Fed. R. Civ. P. 56(a); *Triple Tee Golf*, 485 F.3d at 261 ("The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."). The Court finds that the License Agreement violates *Brulotte* by charging a royalty based on the post-expiration use of U.S. patents but that live foreign patents could support a royalty based on the use of those patents. For the foreign patents to support a royalty, however, there are questions that must be resolved—for example, whether such patents fall under the License Agreement's definition of Licensed RH Patents, and whether any foreign patents are incorporated into the royalty triggering product—the Licensed Halliburton Drill Bit. As stated above, in NOV's motion, it has the burden to affirmatively

raise issues in order for the burden to shift to Halliburton. *See Anderson*, 477 U.S. at 255. As such, because NOV does not allege that any foreign patents are actually incorporated into the Licensed Halliburton Drill Bits, NOV cannot show that it is entitled to summary judgment on Halliburton's *Brulotte* defense as a matter of law. Thus, NOV's motion for summary judgment on *Brulotte* is **DENIED.** (Doc. No. 191).

In Halliburton's motion for summary judgment, it argues that *Brulotte* renders the License Agreement's royalty provision unenforceable. (Doc. No. 196). In that motion, Halliburton bears the burden of establishing that it prevailed on its *Brulotte* defense as a matter of law. To the extent the License Agreement requires royalties to be paid on Licensed Halliburton Drill Bits based on expired U.S. patents, the Court **GRANTS** Halliburton's motion for summary judgment on its *Brulotte* defense.[12]

Nevertheless, any foreign patents incorporated into the Licensed Halliburton Drill Bits could give rise to a royalty. The Court finds, however, that Halliburton has not carried its burden to show that the foreign patents are *not* incorporated in Licensed Halliburton Drill Bits. Thus, the Court finds that there is a genuine issue of material fact which precludes the Court from finding the royalty obligation unenforceable as to the foreign patents. Halliburton's motion for summary judgment is therefore, **DENIED** in part on the question of whether it owes royalties based on the practice of foreign patents.

---

[12]    Again, the Court recognizes the context of these license agreements—often the settling of lawsuits—and the valid economic reasons that might lead parties to enter an agreement such as this one. One could argue, and certainly many have, that *Brulotte* failed to consider common economic interests, contractual factors, and even the language of the Patent Act itself when handing down the patent misuse rule. *See, e.g.*, 10 Phillip E. Areeda *et al.*, ANTITRUST LAW §§ 1782(c)(2)–(c)(3), pp. 505–11 (1996) ("[T]he Supreme Court refused to see that typically such post-expiration royalties merely amortize the price of using patented technology."). As stated above, however, this Court is bound to follow the precedent set by the United States Supreme Court. As such, it applies *Brulotte* as faithfully as possible.

## IV.    Conclusion

Based on the foregoing analysis, the Court **DENIES** NOV's Motion for Summary Judgment. (Doc. No. 191). Further, Halliburton's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. (Doc. No. 196).

Signed on this ___ day of September, 2025.

_____
Andrew S. Hanen
United States District Judge